COMMONWEALTH *vs.* RONALD A. STROTHER.

Suffolk. December 5, 1977. — June 20, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, WILKINS, & LIACOS, JJ.

*Insanity. Practice Criminal,* Capital case, New trial. *Homicide.*

This court declined to exercise its powers under G. L. c. 278, § 33E, to order a new trial for a defendant who claimed that the weight of the evidence at a murder trial pointed to a conclusion that he was insane at the time of the murder where the state of the evidence, including testimony of a psychiatric expert on each side, was such that the jury were warranted in finding either way on this issue. [467-471]

The rule adopted by this court in *Commonwealth v. Mutina,* 366 Mass. 810 (1975), that a defendant is entitled to an instruction regarding the consequences of a verdict of not guilty by reason of insanity, was not retroactive and did not entitle a defendant convicted before that decision to a new trial. [471-472]

INDICTMENT found and returned in the Superior Court on July 7, 1972.

The case was tried before *Linscott*, J.

*Fern L. Nesson* for the defendant.

*John T. Gaffney*, Assistant District Attorney, for the Commonwealth.

QUIRICO, J. The defendant was indicted for the alleged murder on July 2, 1972, of Robert Brown (the victim). The defendant's principal defense was one of not guilty by reason of insanity. The judge submitted the case to the jury with instructions that they could return one of the following verdicts: not guilty, not guilty by reason of insanity, guilty of murder in the first degree, or guilty of murder in the second degree. The judge instructed the jury fully on the elements of the crime of murder in the first degree committed with deliberately premeditated malice aforethought, and murder in the first degree committed with extreme atrocity or cruelty. G. L. c. 265, § 1. The jury returned a verdict of guilty of murder in the first degree.

The defendant's trial counsel seasonably claimed an appeal, but he filed no assignment of alleged errors. The defendant's present appellate counsel, pursuant to leave granted by a single justice of this court under G. L. c. 278, § 33D, filed such an assignment on December 30, 1976.

Although the assignment sets forth fourteen alleged errors, only three of which are described as based on exceptions saved, the defendant has argued none of these errors in his brief; they are therefore all treated as waived. *Commonwealth* v. *Flynn*, 362 Mass. 455, 480 (1972). S.J.C. Rule 1:13, as amended, 366 Mass. 853 (1975). The defendant has elected instead to argue a single issue, stated in his brief to be the following: "Whether this Court should exercise its powers under G. L. c. 278, § 33E to order a new trial based upon the psychiatric evidence of the defendant's insanity adduced at trial."

Having considered the "whole case . . . [on the basis of] the law and the evidence," as required by § 33E,[1] we con-

---

[1] The pertinent language of § 33E, as amended through St. 1974, c. 457, is as follows: "In a capital case as hereinafter defined the entry in

clude that the defendant is entitled to no relief from the judgment.

The following is a brief summary of the evidence of the events, mostly undisputed, relating to the alleged murder of the victim on July 2, 1972. About October 6, 1970, the defendant, then twenty-eight years old, was indicted for two alleged murders unrelated to the present case. Except as otherwise stated below, he was, from that time, continuously in custody at the Suffolk County jail awaiting trial on those two indictments,[2] and was still in custody on the date of the alleged murder involved in the present case. Sometime in October, 1970, he was transferred to the Bridgewater State Hospital (Bridgewater) for psychiatric treatment. He returned to the jail approximately a month later. About midnight of an unspecified date in February, 1971, he attempted to strangle his cell mate at the jail, and he was again committed to Bridgewater for a period of time. On May 7, 1971, when he was back at the jail, the defendant assaulted and beat a different inmate who was then his cell mate. The latter was found lying in a pool of blood. The defendant was again committed to Bridgewater. He returned to the jail on December 14, 1971. Each of the cell mates beaten by the defendant was seventeen or eighteen years old.

the supreme judicial court shall transfer to that court the whole case for its consideration of the law and the evidence. Upon such consideration the court may, if satisfied that the verdict was against the law or the weight of the evidence, or because of newly discovered evidence, or for any other reason that justice may require (a) order a new trial or (b) direct the entry of a verdict of a lesser degree of guilt, and remand the case to the superior court for the imposition of sentence. For the purpose of such review a capital case shall mean a case in which the defendant was tried on an indictment for murder in the first degree and was convicted of murder either in the first or second degree."

[2] There is nothing in the record before us to indicate whether those two earlier murder indictments have been tried or otherwise disposed of, and they have no bearing on the present case except to account for the defendant's status at the jail on July 2, 1972, when he allegedly murdered the victim in the present case.

On June 22, 1972, the victim, then eighteen years old, became the defendant's cell mate. They were the only occupants of the cell. It was equipped with two cots, a sink and a toilet bowl. About 2:40 A.M. on July 2, 1972, a jail guard making his rounds observed both prisoners apparently asleep in their cots, and about 3:30 A.M. another guard making his rounds made the same observation. Sometime between 3:45 A.M. and 4 A.M. several guards who were in the guard room in the rotunda of the jail heard one or more strange noises described as thumps or thuds coming from the direction of the defendant's cell, which was located about sixty feet away. The first guard to arrive at the cell saw the defendant lying on his cot hitting the wall with his arm. The victim appeared to be asleep in his cot with the covers pulled up over his head. The guard asked the defendant if there was anything wrong and the defendant said that he was "OK." The guard returned to the guard room to get coffee for the defendant and while there he again heard a strange noise coming from the cell. When the guard returned to the cell, the defendant blocked the guard's view of the victim. There was a moan and a gurgle coming from the victim's cot. At that time a radio over the victim's cot was playing at a low volume and the defendant turned up the volume. When the guard asked whether the victim was "all right," the defendant replied that he was, and when the guard asked, "Are you sure?", the defendant answered, "I'm sure. But what is it to you, you . . . [foul language not repeated]."

The guard returned to the guardroom where the captain of the guard called the police, and they then returned to the cell. They found the defendant washing his hands. They asked him to get away from the victim so they could take the victim out of the cell. The defendant said to them, "No, he's no good to you, because I killed the . . . [the same foul language not repeated]." The defendant then pulled the covers off the victim exposing the latter's body lying in a pool of blood. The police had then arrived and a guard went to the cell and found that the defendant had pushed his cot

against the cell door to prevent it from being opened, and that he was in the cell holding a broomstick and a rolled up towel. At the guard's request the defendant pulled his cot back from the door and the guard entered the cell, checked the victim for a pulse, found none, and removed the body to the aisle outside the cell. Much blood was flowing from the back of the victim's head. The removal of the body exposed a large blood stain covering much of the upper part of the victim's cot, and there were some spatterings of blood on the wall at one side of the cot. The defendant remained in the locked cell where he cried and said, "Oh, my God, why do I do these things? Why did I kill him?"

About one-half hour later the guards heard loud noises coming from the defendant's cell. When they went there they found that the cell door had been forced open. The defendant was standing outside the cell with a broomstick in one hand and a toilet seat in the other. The toilet seat, which had been pulled off its hinges, was made of cast iron and weighed about fourteen pounds. About 6 A.M. the defendant was moved to another cell. A criminalist who examined and tested some "reddish-brown stains" on the toilet seat determined that "they were [stains by] blood of human origin."

The medical examiner testified that his examination disclosed that the victim had suffered "numerous depressed fractures — that is, fractures that were pushed inward — in the right parietal, right temporal and occipital regions . . . [that t]he total area involved with these fractures measured four by four inches . . . [and that o]ne loose fragment which measured one and a half by two inches, from the right temporal bone . . . had at least four indentations along one edge measuring up to a quarter inch each, producing a serrated appearance." It was his opinion that the nature and type of the object that struck the victim "would have been either a heavy object, or he could have been struck against a heavy object at least four times," and that the toilet seat was "consistent with the type of object that could have caused the injuries." His diagnoses also included "4. Strangulation

by a ligature. 5. Multiple hemorrages of the pharynx, or windpipe." He had no opinion whether the strangulation by ligature or the blows came first. He believed the victim would have died instantaneously, or possibly survived a few minutes, after the first blow.

There was abundant evidence from which the jury could infer and find that the defendant killed the victim, that he did so without excuse, justification, provocation or other mitigating circumstances, and that he did so with either (a) deliberately premeditated malice aforethought or (b) extreme atrocity or cruelty. The Commonwealth is not required to prove both premeditated malice aforethought and extreme atrocity or cruelty to constitute murder in the first degree. G. L. c. 265, § 1. See *Commonwealth* v. *Satterfield*, 362 Mass. 78, 80 (1972); *Commonwealth* v. *Appleby*, 358 Mass. 407, 415-416 (1970). The size and nature of the weapon used, the number of blows, the manner and force with which they were delivered, and the target at which they were directed, viz., the victim's head, would support a conclusion that the killing was with extreme atrocity and cruelty. See *Commonwealth* v. *Eisen*, 358 Mass. 740, and cases cited at 746-747, habeas corpus granted on other grounds, *Eisen* v. *Picard*, 452 F.2d 860 (1st Cir. 1971), cert. denied, 406 U.S. 950 (1972). See *Commonwealth* v. *Eisen*, 368 Mass. 813 (1975).

We now consider the defendant's request for relief under G. L. c. 278, § 33E, based on the psychiatric evidence presented at the trial. The defendant argues first that the verdict in this case was against the weight of the evidence. The evidence on the defendant's claim of insanity came principally from two expert witnesses, one called by each party. Each expert stated his training, experience, and other qualifications in great detail. The qualifications of each were equally impressive and formidable, and neither party questioned the qualifications of the expert called by the other. Predictably, the two psychiatric witnesses expressed diametrically opposite opinions and conclusions on the question whether the defendant was criminally responsible

for his act in killing the victim. We give a brief synopsis of the opinions and conclusions of each, without attempting to state the many reasons on which they were based.

(a) *Dr. Harry Kozol, for the defendant.* Dr. Kozol examined the defendant in January, 1973, and again about two weeks later. He testified that the authorities at Bridgewater diagnosed the defendant on July 12, 1972, ten days after the homicide in question, as schizophrenic reaction, paranoid type, in partial remission . . . [f]eatures of passive-aggressive personality of the aggressive type." He said that "[s]chizophrenic reaction means a mental condition of schism, or split, of the personality [and that p]aranoid type means suspicious, untrusting, and particularly suspicious that a person has enemies who want to do him harm."

As a result of all of the information available to him, and on the basis of his own examinations, Dr. Kozol diagnosed the defendant as a "man [who was] suffering from, and has been suffering from, extreme distortions of his personality, of how his mind and emotional life are built. The label applied to him appropriately is schizophrenia, which means a split personality of such proportions that it is a mental disease." He said that the defendant had a self-hatred because he was of mixed blood, and that this self-hatred is transferred to anyone whom he likes, in this case the victim, who was also of mixed blood.

Dr. Kozol said that the defendant "knows what he is doing. The man is brilliant. . . . [H]e never says anything without knowing what he is saying, and he doesn't do anything without knowing what he is doing, but his knowing what he is doing has no control over what his impulses, which are working out this deeper self-hatred, are performing. . . . There are the two different elements in this man. He can't bring his intellect to bear and to control what he is impelled to do." He quoted the defendant as saying to him: "Why I killed Robby Brown? I don't know. I was well aware of what I was doing. I just carried it out. I was aware of everything that was happening. I didn't feel a thing. I

wasn't in control of myself. . . . I knew what I was doing while I was doing it."

When asked whether the defendant "was in control of his mind and was able to conform his activities to the requirements of the law at the time" he killed the victim, Dr. Kozol answered: "By reason of long-standing mental illness, he was unable to conform his behavior to the requirements of the law, which means that he was unable to control an impulse within himself to kill his cellmate. Intellectually, he knew what he was doing, and he knew how to do it." He further testified that in his opinion the defendant had been suffering from the same mental illness, and the same inability to conform his conduct to the requirements of the law, on the occasions in February and May, 1971, when he attacked two other cell mates.

(b) *Dr. Leo Alexander, for the Commonwealth.* Dr. Alexander examined the defendant on January 25, 1974, less than one month before the start of the trial. He was asked for his "opinion as to whether or not [the defendant] had a mental disease or defect, and if he had such a mental disease or defect, whether he lacked substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." His answer was: "My opinion is that he is suffering neither from a mental disease nor from a mental defect, and that he is, or was and remains capable to appreciate the criminality of his conduct and to conform his conduct to the requirements of law." He said further that he "was absolutely sure that [the defendant] is at all times able to control himself whenever he is inclined to do so."

The doctor's diagnosis of the defendant was: "personality disorder, with emotional instability, hostility, impulsivity, and deficiency of internalized inhibitory controls," and he said that this diagnosis applied as of the date the victim was killed and also went back to when the defendant was about sixteen years of age. He stated the basis of his diagnosis as follows: "a continuous anti-social orientation, composed at first of all kinds of relatively minor violations, gradually

escalating into more and more violative forms. And the motivation, of course, is low self-esteem . . . . These people try to prove their strength and their manliness by breaking laws; and the final, supreme proof of their manliness is their ability to kill. Therefore, these people . . . then, gradually escalat[e] into killers." A person like the defendant might formerly have been referred to as a "psychopath" or a "sociopath," but now his condition is commonly called a "personality disorder, or character disorder, [or] anti-social disorder." Persons with such disorders "have more than average hostility, meaning violent feelings and impulsivity, and they don't have the same amount of inhibitory controls. But they can use these inhibitory controls whenever they want to. In other words, they can turn it on and off; and that's the difference between a homicidal psychopath, for instance, who can turn it on and off, and homicidal schizophrenic, who can't turn it off."

It is clear from the foregoing summaries that the two psychiatric experts addressed themselves to the test of criminal responsibility prescribed by this court in *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967), viz., that "[a] person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirements of law." It is equally clear that the judge instructed the jury in the exact language of the *McHoul* decision as to the defense of lack of criminal responsibility, sometimes referred to as the defense of insanity. The state of the evidence was such that the jury were warranted in finding either way on this issue. They chose to find that the defendant was criminally responsible for his act in killing the victim.

The defendant argues that "[t]he weight of the evidence and the psychiatric testimony . . . point to a conclusion that the defendant was very likely insane at the time he committed the offense," and asks that we set aside the verdict of the jury and allow a new trial for the defendant. We decline to

do so. The question of the defendant's criminal responsibility was put in issue by the defendant, was fully and fairly tried with testimony of a psychiatric expert on each side of the issue, was submitted to the jury for decision after unquestioned instructions by the judge, and was decided adversely to the defendant. The jury are responsible for determining the weight and credibility of all evidence presented to them, and that applies as well to psychiatric testimony as it does to other types of testimony. *Commonwealth* v. *Smith*, 357 Mass. 168, 178 (1970). In our opinion there is nothing in the circumstances of this case which suggests that we should reverse or otherwise disturb the jury's conclusion that the defendant was criminally responsible for his conduct in killing the victim. The defendant places much reliance on our decision in *Commonwealth* v. *Cox*, 327 Mass. 609, 614-615 (1951), where we exercised our power under G. L. c. 278, § 33E, to order a new trial after the jury had rejected the defendant's plea of insanity. However, the evidence in the *Cox* case casts far more serious doubt on the defendant's criminal responsibility than is present here. We think this case is much more similar to *Commonwealth* v. *Marshall*, 373 Mass. 65, 70-71 (1977), where we denied § 33E relief although psychiatric evidence was presented by both the Commonwealth and the defendant, and the jury decided that the defendant was responsible.

The concluding argument by the defendant is that he should be granted a new trial to entitle him to the benefit of the rule established by this court in *Commonwealth* v. *Mutina*, 366 Mass. 810, 816-823, 823 n.12 (1975), to the effect that when "the defense of insanity is fairly raised [in a criminal case], the defendant, on his timely request, is entitled to an instruction regarding the consequences of a verdict of not guilty by reason of insanity [and that s]uch an instruction shall also be given on the request of the jury, if the defendant does not object thereto." The rule, which was adopted by a narrowly divided court, was expressly limited to trials and retrials after the date of that opinion. *Id.* at 823

n.12. It certainly was not contemplated that a defendant convicted prior thereto, *as was* the defendant in the present case, could resort to the device or stratagem of a motion for a new trial for the sole purpose of obtaining the benefit of the rule, absent other grounds on which a new trial might be granted.

We have reviewed the entire case, both on the law and the facts, to the full extent required by G. L. c. 278, § 33E, and we conclude that the defendant is not entitled to a new trial or to any other relief.

*Judgment affirmed.*