COMMONWEALTH vs. ARTHUR J. CUNNEEN.

Middlesex. January 4, 1983. — May 16, 1983.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Practice, Criminal,* Mistrial, Comment by prosecutor, Capital case, Instructions to jury. *Homicide. Evidence,* Record of past knowledge.

At a murder trial, a single inadvertent reference, in the prosecutor's opening statement, describing a certain person as the defendant's probation officer, followed by prompt curative instructions from the judge, was not so prejudicial as to require allowance of the defendant's motion for a mistrial. [223-224]

Testimony at a murder trial by the president of the corporation that operated the restaurant where the defendant had been employed as a kitchen worker, respecting the type of detergent the restaurant used at the time of the crime and at the time several months later when chemical tests were performed, was properly admitted as based upon the witness's recollection refreshed by his examining invoices for the time periods in question. [224-226]

Conviction of first degree murder on the basis that the crime was committed with extreme atrocity or cruelty does not require proof that the defendant had either a specific mental intent or a knowledge of the character of his acts beyond the proof of malice aforethought required for a conviction of murder. [226-229]

Where a defendant was convicted of murder in the first degree prior to this court's decision in *Commonwealth v. Gould,* 380 Mass. 672 (1980), and where his mental condition was not made an issue at his trial, justice did not require that he be granted a new trial pursuant to G. L. c. 278, § 33E, in order to permit jury consideration of the possible effect of his "borderline" mental retardation on the issue whether he committed the murder with extreme atrocity or cruelty. [229-231] ABRAMS, J. concurring.

INDICTMENT found and returned in the Superior Court Department on July 10, 1979.

The case was tried before *Hallisey,* J.

*John F. Palmer* for the defendant.

*Susan C. Mormino*, Assistant District Attorney, for the Commonwealth.

HENNESSEY, C.J. The defendant, Arthur J. Cunneen, appeals from his conviction of murder in the first degree.[1] He raises three objections to the conduct of his trial. He says that it was error for the judge to deny the defendant's motion for a mistrial when evidence was received which implied that the defendant had been involved in other crimes; that certain testimony as to chemical detergents was improperly admitted in evidence; and, finally, that the judge's instructions to the jury did not adequately permit the jury's consideration of the defendant's mental retardation. We conclude that the defendant's claims lack merit, and that the verdict is otherwise consonant with justice; accordingly, we affirm the judgment of conviction.

The facts are summarized as follows. The Commonwealth alleged that sometime between 9 P.M. and 10 P.M. on May 2, 1979, the defendant murdered David M. Cecere, a thirteen year old boy. The murder allegedly occurred on or near a railroad loading platform behind an A & P warehouse in Somerville, where the victim's body was discovered with multiple stab wounds, cuts and bruises, and his throat slit, on the morning of May 3, 1979. The doctor who performed the autopsy on the victim testified at trial that the victim's throat injuries resulted from multiple blows of marked force inflicted by a strong cutting instrument, and that these injuries caused the victim's death. He also testified that in his opinion the victim was lying on his back on the platform when the fatal blows were administered, but that the victim sustained other wounds while he was on the roof of the warehouse or on the way down to the platform.

Lieutenant John J. McCune, Jr., a Somerville police detective, testified at length at trial. He stated that he observed the victim's body on the platform on the morning of

---

[1] The defendant's first trial ended in a mistrial. His second trial resulted in the verdict of guilty of murder in the first degree, on April 18, 1980.

May 3, 1979. Several other police officers were present at the scene, including Lieutenant Thomas Castles and Trooper Roderick Hendrigan of the State police. A ring with two keys was removed from the victim's clothing. Later that morning, McCune and Castles read a missing persons report filed that morning by the victim's mother, Mrs. Rose Cecere. The police went to the Cecere home, at 32 Newtown Court Housing Project, Cambridge. Hendrigan opened the outside door and the door to the Cecere apartment with the keys taken from the victim's body. Mrs. Cecere identified the keys as belonging to her son, David.

As the police officers left 32 Newtown Court, they saw the defendant approaching in the company of several other police officers. The defendant lived with his mother in an apartment at 63 Washington Elms Housing Project, which is adjacent to 32 Newtown Court, and he was acquainted with the victim. McCune told the defendant that they were trying to locate David Cecere, and had information that the defendant might have been the last one seen with him. The defendant agreed to accompany the police to the Somerville police station, arriving there about 12:30 P.M.

At the police station, McCune and Hendrigan led the defendant to a private office and read him his Miranda rights. The defendant said he understood them and, when asked if he wanted to read the card himself, expressed a desire to do so. McCune asked the defendant if he could read; the defendant stated that he could, and had trouble only with the word "Miranda." After that was explained to him, the defendant signed the card. The parties stipulated at trial that the defendant had an I.Q. of eighty, which is considered borderline retardation.

McCune then asked the defendant how he received scratches on his forehead and fingers. The defendant said he scratched his hands washing dishes at work, and cut his forehead cleaning an oven at work. The defendant said he received one cut, which was covered with a bandaid, when his cat scratched him the previous night.

The defendant then described his activities on May 2, 1979. He worked during the day at Soupçon Restaurant, Boston, arrived home at 5:30 P.M., had coffee with his mother, and watched television. At 6 P.M., he received a telephone call from a friend, Thomas Coyne. They agreed to meet later at Boylston and Arlington streets, Boston. Coyne called again about 8 P.M., and asked the defendant to bring along Coyne's white scarf.

The defendant left his apartment at 8:10 P.M., and exchanged greetings with the victim, who was playing ball with other boys in the courtyard. He walked to Boston, and met his friends, Coyne, Dale Morgan, and "Angel" about 9:45 P.M. He left about 11 P.M., and returned home at 11:30 P.M. When he arrived home, his mother told him that Mrs. Cecere had visited their apartment to ask about her son, David. The defendant went to the Cecere home, and told Mrs. Cecere that he had seen her son earlier playing ball, but did not know where he was. The defendant returned home, watched television, and went to bed.

The next day, the defendant did some errands for his mother in Central Square, Cambridge. He saw Mrs. Cecere coming out of the Cambridge police station. She told him she had reported her son missing, and the defendant said, "[I]t's a cause to worry, because of all the girls that they're finding in ash barrels in Boston, dead." At trial, Mrs. Cecere confirmed the substance of this conversation.

McCune then asked the defendant if he had ever owned a knife and the defendant responded that he had not carried a knife since Halloween. McCune also asked the defendant if he would take a benzidine test, explaining that the test would indicate whether there had been blood on his skin. The defendant agreed, and asked if he could speak with Donald Allard, who was later summoned to the station. The defendant then left the station to obtain cigarettes and coffee. When he returned, he was interrogated by Castles and Detective William McKenzie of the Somerville police department, and repeated essentially the same story he had told McCune.

At approximately 3:30 P.M., the defendant spoke private-
ly to Donald Allard, chief probation officer of the Middlesex
County Superior Court. Allard testified at trial that he had
known the defendant "pretty well" for about two and one-
half years, that he had conversed with him seventy-five to
100 times, and that their relationship was "cordial." Allard
knew that there had been a homicide. The defendant told
Allard that the police were questioning him about a missing
boy and that he wanted Allard to help him convince the
police that he had had nothing to do with it. The defendant
repeated his account of his activities the day before, and
stated that he had cut his forehead at work.

Paul Conley, a State police chemist, then administered a
benzidine test and detected blood on the defendant's fore-
arms, upper arms, and on the rings on his hands. After the
benzidine test, Castles told the defendant that David Cecere
had been murdered. Allard was present. He testified that
the defendant "show[ed] some emotion" and said he now
knew why he was being questioned about the scratches, the
bloodstains, and the knife. Allard asked the defendant if
the police had mentioned how the victim was murdered and
the defendant replied, "[H]e had his throat cut." At trial,
the Commonwealth attempted to show that the police had
not told the defendant in what manner the victim was
killed. McCune testified that the defendant was not a
suspect in the murder until 4:30 P.M. or 4:45 P.M. on May 3,
1979, when Mrs. Cecere identified the body of her son.

At trial, the Commonwealth disputed the defendant's ac-
count of his activities on May 2, 1979. Angela Perigo, who
was fourteen at the time of the murder, lived in the same
housing complex as the defendant. She testified that on the
evening of May 2, 1979, she observed the victim playing ball
in the courtyard with some other children. He remained in
the courtyard after the others left. She then saw the de-
fendant standing in his doorway, saw the victim go over to
the defendant, and saw the two leave the courtyard togeth-
er. She fixed the time at about 9:15 P.M. because she had
just watched the first few minutes of the television program,

"Charlie's Angels," which came on at 9 P.M. According to a WCVB-TV employee, the program log indicated that "Charlie's Angels" was broadcast from 9 P.M. to 10 P.M., on May 2, 1979.

Thomas Coyne testified that he telephoned the defendant at his home at 5:30 P.M., and again at 7:30 P.M., on May 2, 1979. At 10:45 P.M., he observed the defendant emerge from the Arlington Street subway station. He noticed scratches on the defendant's forehead, which the defendant said had happened at work. They spoke for about one-half hour, and made plans to meet the next day. Coyne also testified that he had seen the defendant with a buck-knife several days before the murder, outside a bar. At that time, the defendant gave the knife to Coyne, who kept it. When the police later asked to see the knife, Coyne said it was missing.

The defendant's mother, Julia Cunneen, testified that on May 2, 1979, the defendant spoke to Coyne at 7:45 P.M., and then got dressed and went out. He returned at about 10 P.M., went back out, and came home again at 11:30 P.M.

McCune testified that he had walked from Washington Elms to a place near where the victim was found. The distance was eight-tenths of a mile and took about twenty minutes to walk. He also testified that the courtyard at Washington Elms was "very brightly lit."

Conley described the benzidine test in some detail at trial. By one method, two chemical solutions are applied sequentially to the surface to be tested; using another method, the surface is wiped with a special filter paper which is then treated with the two chemical solutions. Conley used both methods on the defendant's arms. If blood has been on the surface, there will be a "catalytic," or spreading color-change reaction after the second step. Conley testified that this test is accurate on skin for at least two days. He also testified that the cuts on the defendant's hands could have caused the positive test reaction if the defendant had spread the blood from the cuts to his upper arms.

Conley testified that when the test is administered in two steps, as was the test he gave the defendant, it is conclusive for blood. Although oxidizing agents, such as detergents, and plant substances can interfere with a benzidine test, Conley testified that he was able to eliminate their presence because the benzidine test he gave the defendant was a two-step test, and oxidizing agents will react after the first step, while blood will react only after the second step. Oxidizing agents also will have a localized, rather than a spreading color-change reaction. Moreover, in December, 1979, Conley tested every detergent and cleanser with which a pot washer would have come in contact at Soupçon. He found that two of these dry detergents reacted with the first step of the benzidine test, and that the color reaction did not spread. Stephen E. Elmont, president of the corporation that owns Soupçon, testified that there were no differences between the detergents ordered in May, 1979, when the defendant worked there, and December, 1979, when the samples were tested. The defendant objected to Elmont's testimony. As to plant substances, Conley testified that these will react only when they are wet, and therefore visible on the surface to be tested. He testified that the defendant's arms were clean and dry when he performed the test.

Conley later tested various locations at the scene of the crime and areas in the defendant's home. He confirmed the presence of blood on the loading platform, and got positive results on the bathroom sink, the bathtub, and the doorknobs leading into and out of the defendant's apartment. He also got slightly positive results on the soles of a pair of loafers. Conley testified that on an inanimate object, the test could work as long as "the material present on the surface is still chemically blood . . . even if it was a year."

The defendant submitted an expert's testimony suggesting a benzidine test is only presumptive evidence of the presence of blood, and requires other tests to be conclusive. Defense counsel also read to the jury prior testimony from Dale Morgan, who was unavailable at the time of trial. In that testimony, Morgan stated that he saw the defendant in

Boston about 11:15 P.M. to 11:30 P.M., on May 2, 1979. Finally, the defendant recalled Julia Cunneen, who testified that a few days prior to May 2, 1979, her arm bled as a result of having been scratched by her cat, and she washed the blood off in the bathroom sink.

1. In her opening statement, the prosecutor mentioned the defendant's request at the police station to see "his probation officer, one Donald Allard." At the completion of her statement, the defendant requested a mistrial, arguing that he was prejudiced by this reference to Allard as his probation officer because the jury could thereby infer that he had been involved in other crimes. The motion was denied, and the judge immediately instructed the jury that the prosecutor's opening statement was not evidence, and that they would decide the case "on the evidence . . . and nothing else." At the end of the trial, he again instructed the jury that "[c]ounsel's statements are not evidence . . . . [I]f you heard anything in the opening or in the arguments that you didn't hear from the witness stand, it is not evidence." The prosecutor also stated in her opening that counsel's statements "including this opening argument . . . [are] not evidence in this case. . . . Again, my argument to you is not evidence." Defense counsel made a similar statement in his closing argument.

"The decision whether to declare a mistrial is a matter within the judge's discretion." *Commonwealth* v. *Simmonds*, 386 Mass. 234, 241 (1982). There was no error here. Evidence of a defendant's prior crimes is not generally admissible at trial. *Commonwealth* v. *Roberts*, 378 Mass. 116, 125 (1979). *Commonwealth* v. *Kosior*, 280 Mass. 418, 423 (1932). However, we conclude that the defendant was not so prejudiced by the reference to Allard's being his probation officer that a mistrial was required. The prosecutor's remark was apparently inadvertent, and was not repeated.[2] Moreover, it was a vague and fleeting com-

---

[2] When Allard testified, he described himself as the chief probation officer of the Superior Court in Middlesex County, and stated that he had

ment, not likely to influence, or even to seize the attention of the jury. Cf. *Commonwealth* v. *Bearse*, 358 Mass. 481, 487-488 (1970); *Commonwealth* v. *Nassar*, 351 Mass. 37, 44-45 (1966). The judge gave prompt corrective instructions, and repeated them in his charge to the jury. These instructions were sufficient to avert any prejudice to the defendant in the circumstances. See *Commonwealth* v. *Breese*, 381 Mass. 13, 15-16 (1980); *Commonwealth* v. *Fazio*, 375 Mass. 451, 457-458 (1978); *Commonwealth* v. *Clifford*, 374 Mass. 293, 297-299 (1978); *Commonwealth* v. *Lacy*, 371 Mass. 363, 365 (1976).

2. The defendant objected to a portion of the testimony of Stephen E. Elmont, president of the corporation that owns Soupçon Restaurant, on the ground that it was incompetent because it was not based on Elmont's personal knowledge but rather on records which were not produced at trial. Elmont's disputed testimony was that the detergents ordered in May, 1979, when the defendant worked at the restaurant, and in December, 1979, when Conley tested them, were the same. The defendant argues that Conley's testimony as to the tests performed in December, 1979, was "an important link in the chain of circumstantial evidence against him. . . . Because the essential foundation for this important evidence was improperly admitted, the defendant should be granted a new trial."

Elmont testified that he supervised the operation of three restaurants, including Soupçon; that he knew the defendant and was familiar with his responsibilities as a kitchen utility worker; that the detergents and other chemical substances with which the defendant would have come in contact at Soupçon were ordered from a particular company, and that Elmont was familiar with them. He then testified that he had investigated the detergents ordered in May and December, 1979, by referring to invoices for both time periods.

known the defendant for two and one-half years. The jury were left to draw their own conclusions as to the relationship between Allard and the defendant.

The prosecutor asked what differences there were between the detergents ordered in May and December, 1979, based on Elmont's investigation. The defendant objected, and the testimony was excluded, the judge making reference to "a best-evidence problem, and probably a hearsay problem, and possibly a regular-course-of-business-records problem." The prosecutor then rephrased her question, and asked Elmont whether he had "a specific memory as to what you had ordered" in May and December, 1979, before looking at the invoices. Elmont responded, "No." She then asked: "After looking at those invoices, was your memory refreshed as to what you had ordered for those periods of time?" Elmont replied, "Yes," and testified, over the defendant's objection, that there was no difference between the detergents ordered in the two periods.

Elmont testified that he had refreshed his recollection by examining the invoices. This was permissible. See K. B. Hughes, Evidence § 582, at 800 n.9 (1961). It appeared from Elmont's testimony that he was familiar with many details of the operation of Soupçon Restaurant, including the detergents ordered. This evidence, coupled with Elmont's own assertion that his memory was refreshed, indicates that the disputed testimony was based on his own personal knowledge refreshed by the invoices, not on the invoices themselves. His testimony was admissible. *Commonwealth* v. *Cote,* 5 Mass. App. Ct. 365, 370-371 (1977). See *Commonwealth* v. *Hoffer,* 375 Mass. 369, 376 (1978).

Even if there were error in admitting Elmont's testimony, it would be harmless. The Commonwealth's expert, Conley, testified that oxidizing agents, such as the detergents, and the other chemical substances obtained from Soupçon, would react after the first step of the benzidine test he gave the defendant, while blood would react only after the second step. The defendant's expert also testified that a two-step benzidine test eliminates the possibility of interference by an oxidizing agent. Similarly, both experts testified that oxidizing agents would not produce a spreading color-change reaction. Thus, without reference to the tests Con-

ley performed on the substances from Soupcon, the evidence established that oxidizing agents could not have caused the positive test reaction Conley described.

3. The judge charged the jury on premeditation and extreme atrocity or cruelty as bases for a conviction of murder in the first degree.[3] The defendant made no objection to the charge at trial, but he now asserts two distinct arguments for relief under G. L. c. 278, § 33E, based upon the evidence of the defendant's mental retardation. Both of these arguments are rooted in this court's language in two cases decided after the defendant's trial, *Commonwealth v. Gould*, 380 Mass. 672 (1980), and *Commonwealth v. Perry*, 385 Mass. 639, 648-649 (1982).

In the first of these two arguments, the defendant says that our language in *Gould* and *Perry* compels the conclusion that a defendant may be convicted of murder in the first degree based upon extreme atrocity or cruelty only if it is found that the defendant had a specific mental intent or knowledge of the character of his acts beyond the malice aforethought required for murder in the second degree. This precise argument was neither raised nor considered in the *Gould* and *Perry* cases. Indeed, in each of those cases, we noted that the defendant did not raise the question whether some additional mental intent was required to support a conviction of murder in the first degree based on extreme atrocity or cruelty. *Commonwealth v. Perry, supra* at 649 n.14. *Commonwealth v. Gould, supra* at 683 n.14.

In *Commonwealth v. Gould*, we held that a jury should be allowed to consider evidence of a defendant's impaired mental capacity at the time the murder was committed as one factor in determining whether the crime was committed with extreme atrocity or cruelty. The "major issue" in *Gould* was "the effect of the defendant's serious, long-standing mental illness on the conduct complained of."

---

[3] "Murder committed with deliberately premeditated malice aforethought, or with extreme atrocity or cruelty . . . is murder in the first degree." G. L. c. 265, § 1. St. 1858, c. 154.

*Commonwealth* v. *Gould, supra* at 685. In *Commonwealth* v. *Perry, supra* at 649, we relied on *Gould,* in holding that the defendant should have received a requested instruction allowing the jury to consider the defendant's intoxication on the issue of whether the murder was committed with extreme atrocity or cruelty.

We adhere to our view that proof of malice aforethought is the only requisite mental intent for a conviction of murder in the first degree based on murder committed with extreme atrocity or cruelty. This has been our consistent interpretation of G. L. c. 265, § 1, St. 1858, c. 154, since *Commonwealth* v. *Gilbert,* 165 Mass. 45, 59 (1895), where we held that under the statute "[a] murder committed with malice aforethought may be found to have been committed with extreme atrocity or cruelty, even though the murderer did not know that his act was extremely atrocious or cruel." *Commonwealth* v. *Monsen,* 377 Mass. 245, 253 (1979) (not necessary to show any intent beyond malice aforethought or that defendant was cognizant of extraordinary nature of his actions). *Commonwealth* v. *Golston,* 373 Mass. 249, 260 (1977), cert. denied, 434 U.S. 1039 (1978) (no requirement that the defendant know that his act was extremely atrocious or cruel, and no requirement of deliberate premeditation). See *Commonwealth* v. *Gould, supra* at 683 n.14; *Commonwealth* v. *Campbell,* 378 Mass. 680, 687 (1979); *Commonwealth* v. *Clifford,* 374 Mass. 293, 307 (1978); *Commonwealth* v. *Lacy,* 371 Mass. 363, 367-368 (1976). But see Annot., 83 A.L.R.3d 1222 (1978), discussing rules of other States. We have delineated a number of factors which a jury can consider in deciding whether a murder was committed with extreme atrocity or cruelty. These include indifference to or taking pleasure in the victim's suffering, consciousness and degree of suffering of the victim, extent of physical injuries, number of blows, manner and force with which delivered, instrument employed, and disproportion between the means needed to cause death and those employed. See, e.g., *Commonwealth* v. *Monsen, supra*; *Commonwealth* v. *Strother,* 375 Mass. 462, 467 (1978); *Com-*

*monwealth* v. *Golston, supra.* There is no question that the judge instructed the jury appropriately as to these factors, and as to the law applicable at the time of the trial. Thus, the judge instructed that "[i]t is not necessary that the defendant know that his act was extremely atrocious or cruel. . . . That is, you look at it objectively, from what an outsider would conclude." He also told the jury to "evaluate all the factors, considering suffering, the instrumentality used as compared with those available, the extent of injury . . . weapons used, number of blows, manner and force [and] part of the body of the victim that was attacked." He also paraphrased several illustrative opinions, including *Commonwealth* v. *Devlin,* 126 Mass. 253, 255 (1879), to the effect that "[t]he question is left largely for the determination of the jury to consider whether the case presents a case of such savage, unfeeling, [and] long-continued brutality," and *Commonwealth* v. *Golston, supra,* that "[i]ndifference to the victim's pain [is an] appropriate factor."

*Commonwealth* v. *Gould,* 380 Mass. 672 (1980), established only that a defendant's impaired mental capacity is an additional factor which the jury should consider in determining whether the murder was committed with extreme atrocity or cruelty. We reasoned that "if a malicious mind may be considered as evidence that a defendant committed a murder with extreme atrocity or cruelty, then fairness requires that an impaired mind may also be considered." In addition, "[t]he jurors' broad discretion will more accurately reflect the community's conscience, goals, and norms, if the jurors . . . are also permitted to consider the defendant's peculiar mental state." *Commonwealth* v. *Gould, supra* at 684-685. Thus, we have diluted the objective test to some extent, since indifference to or pleasure in the victim's pain, as well as a defendant's reduced mental capacity, is considered relevant. We decline to go further. The defendant would have us transform an evidentiary factor which the jury can consider into an entirely new element of the crime of murder committed with extreme atrocity and cruelty. "To import a mens rea requirement into the words 'extreme

atrocity or cruelty' would be to blur the distinction between that form of murder in the first degree and the premeditated variety. . . . Although the inference that the actor possesses a particularly brutal state of mind might be warranted by the objective circumstances of the killing, no such inference is necessary in order to convict." *Commonwealth* v. *Monsen*, 377 Mass. 245, 254 (1979). See *Commonwealth* v. *Gilbert*, 165 Mass. 45, 58-59 (1895); *Commonwealth* v. *Desmarteau*, 16 Gray 1, 9-10 (1860).

The defendant's second argument premised on *Gould* (decided one month after the trial in the instant case) is that we should apply the principles of that case here, and grant relief upon the ground that the jury should have been instructed that they could consider the defendant's mental defect in determining whether the defendant committed the murder with deliberate premeditation or extreme atrocity or cruelty. We agree that a defendant who is mentally retarded to a significant degree may have a mental impairment within the meaning of *Gould*, justifying appropriate jury instructions. Mental retardation, like mental illness or intoxication, may affect the defendant's ability to premeditate or "to make a decision in a normal manner [which] may have a direct bearing on . . . the issue of extreme atrocity or cruelty." *Commonwealth* v. *Gould, supra* at 686.

We express no opinion whether, if the issue had been seasonably raised by the defense at trial, the judge would have been required, in the marginal circumstances of this case, to include the *Gould* principles in his charge to the jury. Where, as in this case, the defendant was tried before we issued our opinion in *Gould*, and there was neither a request by defense counsel for instructions on the defendant's mental impairment, nor an objection by the defense to the charge in this context, we will not apply *Gould* unless justice requires. See G. L. c. 278, § 33E; *Commonwealth* v. *Brown*, 387 Mass. 220, 225-227 (1982); *Commonwealth* v. *Brown*, 386 Mass. 17, 32-33 (1982); *Commonwealth* v. *Shelley*, 381 Mass. 340, 354-355 (1980). Cf. *Commonwealth* v. *Perry*, 385 Mass. 639, 640 (1982) (case tried after *Gould*,

conviction reduced to murder in the second degree because judge improperly refused to give requested instruction based on *Gould*).

The only evidence at trial about the defendant's mental state was the stipulation that he had an I.Q. of eighty and was considered borderline mentally retarded. A Bridgewater State Hospital report presented at a hearing on a motion to suppress stated that the defendant's "[t]hought process is coherent and logical. . . . Insight is fair. Judgment at this point seems adequate." The doctor's opinion was that the defendant "does not at this time manifest the signs and symptoms of major mental illness. . . . [H]is current presentation is consistent with borderline mental retardation." As to criminal responsibility, the report noted: "It is true that mental deficiency is frequently accompanied by decreased capacity to control impulses. On the other hand, the patient seems to be leading a fairly well planned and stable life." This report added nothing to the evidence of the defendant's borderline mental retardation as stipulated at trial. The evidence at trial established that the defendant was employed, was able to help his mother in running the home, and had formed social relationships. This evidence was borne out by the Bridgewater report. Thus, despite his somewhat low I.Q., the defendant was apparently functioning adequately at the time of the murder. The focus at trial was not on the defendant's mental capacity, but on the identification of the defendant as the murderer. "This is not a case that requires the retroactive application [of] the rule set forth in *Gould*." *Commonwealth* v. *Brown, supra* at 33. Cf. *Commonwealth* v. *Mazza*, 366 Mass. 30, 33 (1974) (We refused to grant relief under § 33E solely because the defendant's over-all I.Q. was seventy-seven, and we added, "although we do not state that the mental retardation of a defendant may not be a factor for consideration under § 33E in an appropriate case"). See generally *Commonwealth* v. *Mandeville*, 386 Mass. 393, 412-413 (1982); *Commonwealth* v. *Kostka*, 370 Mass. 516, 537-539 (1976).

After review of the entire record pursuant to G. L. c. 278, § 33E, we find no basis on which to disturb the verdict of guilty of murder in the first degree.

*Judgment affirmed.*

ABRAMS, J. (concurring). I agree with the court that there is no reason for us to exercise our power under G. L. c. 278, § 33E. However, I do not join in the court's discussion of the application of *Commonwealth* v. *Gould*, 380 Mass. 672 (1980), to the instruction on extreme atrocity and cruelty in this case. I believe that it is unnecessary to address the application of *Gould*. I do not dissent because the court, albeit grudgingly, accepts our decision in *Gould*. *Supra* at 228-229.

Our duty under G. L. c. 278, § 33E, is to consider broadly the whole case on the law and the facts to determine whether the verdict is "consonant with justice." *Commonwealth* v. *Seit*, 373 Mass. 83, 94 (1977). *Commonwealth* v. *Gould*, 380 Mass. 672, 680 (1980). *Commonwealth* v. *Cole*, 380 Mass. 30, 38-39 (1980). We have repeatedly said that "[n]either the conventional type of appellate review permitted in a criminal case, nor the special type prescribed by G. L. c. 278, § 33E, for a 'capital case,' is intended to afford an opportunity, from the vantage point of hindsight, to comb the trial record for interesting questions which could have been, but in fact were not, raised at the trial, or to attempt to convert the consequences of unsuccessful trial tactics and strategy into alleged errors by the judge." *Commonwealth* v. *Johnson*, 374 Mass. 453, 465 (1978). *Commonwealth* v. *Ely*, 388 Mass. 69, 73 (1983). *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 280 (1982). *Commonwealth* v. *Lee*, 383 Mass. 507, 512 (1981). Despite our statement, the court in this case, for the first time, answers an issue not raised below and not raised by the evidence, cf. *Commonwealth* v. *Gould*, 380 Mass. 672 (1980); *Commonwealth* v. *Cole*, *supra*, but which presents an "in-

teresting question of law." Since the evidence does not warrant consideration of the question raised by Cuneen, I would not reach or answer it, and I do not join in that portion of the opinion.

In this case, there is insufficient evidence in the record showing that the defendant suffered from a degree of mental impairment similar to that in *Gould*. At trial, there was only evidence that the defendant had an I.Q. of eighty and was considered borderline mentally retarded. Other evidence tended to show that he was functioning coherently and was leading a stable life. Thus, an instruction based on *Gould* was not essential, and the lack of such an instruction did not create a substantial risk of a miscarriage of justice, warranting the use of our G. L. c. 278, § 33E, power to reduce the verdict or remand for a new trial. As this reasoning is dispositive, I believe that the court should not have addressed any further interpretation of *Gould*. See *Commonwealth* v. *Graham*, 388 Mass. 115, 123 (1983).

I adhere to my view that proven mental impairment is directly related to the issue of the degree of guilt, and that "fairness requires that an impaired mind may also be considered as evidence bearing on whether or not the defendant committed the murder with extreme atrocity or cruelty." *Commonwealth* v. *Gould*, 380 Mass. 672, 684-685 (1980).