COMMONWEALTH VS. CLYDE THOMAS.

Bristol. December 7, 2006. - January 9, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & SOSMAN, JJ.

*Homicide. Constitutional Law,* Assistance of counsel, Confrontation of
witnesses. *Due Process of Law,* Assistance of counsel, Defendant wearing
prison clothing at trial. *Practice, Criminal,* Capital case, Assistance of
counsel, New trial, Jury and jurors, Voir dire, View, Confrontation of wit-
nesses, Instructions to jury. *Jury and Jurors. Evidence,* Competency, San-
ity, Insanity, Opinion, Prior misconduct. *Witness,* Child, Competency.
*Mental Impairment.*

The judge considering the criminal defendant's motion for a new trial did not
err in concluding that, at the trial of an indictment charging murder in the
first degree, the defendant's counsel made a reasonable strategic decision,
agreed to by the defendant, to have the defendant wear prison clothing
[185-186]; further, the judge properly denied the motion without conduct-
ing an evidentiary hearing, where the motion did not raise a substantial is-
sue [186].

At a murder trial, the judge did not abuse his discretion in denying the
defendant's motion requesting that proposed questions pertaining to
violence against women be asked, in individual voir dire, of prospective
jurors, where the standard questions were adequate in the circumstances to
ferret out possible bias or prejudice on the part of prospective jurors.
[186-187]

The judge at a criminal trial acted within his discretion in denying the
defendant's request to attend a view taken by the jury, where the defendant
gave no reason that would require his presence. [187]

There was no merit to the criminal defendant's after-the-fact argument that an
eight year old witness should not have been allowed to testify without a
preliminary hearing to determine her competency, where it was manifest
from the record that the witness was competent to testify. [187]

At the trial of an indictment charging the defendant with murder in the first
degree, in which the defendant raised the defense that he was not criminally
responsible, the judge properly permitted certain witnesses to describe
what they observed about the defendant's conduct and demeanor, and in
view of the extensive expert testimony about the defendant's criminal
responsibility, the jury could not have been misled into thinking that the
testimony expressed *improper lay opinions about the defendant's sanity*
[187-188]; likewise, the judge properly permitted testimony about the
defendant's controlling nature, the hostile relationship between the
defendant and the victim, and his prior abuse of the victim, where the
evidence was probative to show a pattern or course of conduct by the

defendant, to describe the entire relationship between the defendant and the victim, and to prove that the defendant acted intentionally and with criminal responsibility when he killed the victim [188]; finally, testimony from a police officer about the victim's statements with regard to a prior incident of abuse by the defendant did not raise any confrontation issues, where the evidence was properly admitted for a nonhearsay purpose that was carefully defined by the judge in a limiting instruction [188].

At a murder trial, the judge did not err in declining the defendant's request to instruct the jury on the effect of "alleged intoxication" on the defendant's mental impairment, where there was substantial evidence that the defendant was not impaired by alcohol or drug use when he stabbed the victim [188-189]; further, where the judge's instructions made clear to the jury that they should consider mental impairment on the question whether the killing was committed with extreme atrocity or cruelty, the judge was not required to make specific reference to the factors set forth in *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983), in his instructions on mental impairment [189].

This court saw no basis to exercise its power under G. L. c. 278, § 33E, to reduce a verdict of murder in the first degree on the basis of extreme atrocity or cruelty, where the killing was committed with brutality, and where there was adequate evidence to prove that the defendant was criminally responsible when he repeatedly stabbed the victim. [189]

INDICTMENT found and returned in the Superior Court Department on December 16, 1999.

The case was tried before *Patrick F. Brady*, J., and a motion for a new trial, filed on July 29, 2005, was considered by him.

*Alan Jay Black* for the defendant.

*William R. Connolly*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury in the Superior Court found the defendant guilty of murder in the first degree of his girl friend (victim) on the basis of extreme atrocity or cruelty.[1] The defendant's motion for a new trial was denied by the trial judge on the basis of affidavits, without an evidentiary hearing. The defendant is represented on appeal by counsel who represented him in connection with his motion for a new trial. The defendant argues multiple issues. We affirm the conviction and the order denying

---

[1]The Commonwealth had also proceeded under a theory of deliberate premeditation, which the jury rejected. The jury acquitted the defendant on additional charges of armed assault with intent to murder and assault and battery by means of a dangerous weapon alleged to have been committed on the victim's mother's boy friend.

the motion for a new trial. We also conclude that no basis exists to exercise our power under G. L. c. 278, § 33E, to reduce the conviction of murder or to order a new trial.

The Commonwealth presented evidence that the defendant and the victim began dating when the victim was fifteen years old and the defendant was in his mid-twenties. Their relationship, which continued intermittently for approximately five years, was volatile, marked with arguments and breakups, jealousy and control by the defendant, and physical violence against the victim. When the victim was sixteen years of age, she gave birth to a daughter, Shayla. The defendant is Shayla's father.

The victim (and Shayla) lived in Mansfield with the victim's father (Richard White) and brother (Rick), as well as in an apartment in Attleboro with her mother (Regina White), her mother's boy friend (Larry Toombs), and their three young children (Amanda, Bruce, and Tom). At some point, the defendant began staying at the Attleboro apartment when the victim was there.

On December 2, 1999, the defendant was helping a contractor, Peter Louis Baker, at the Attleboro apartment. Baker noticed that the defendant, who had not been drinking, was very quiet and calm. After helping Baker, the defendant helped out around the apartment, attended to Shayla, and played with Shayla and Tom. The victim arrived home from work at approximately 4:30 P.M.

A little while later, the victim, the defendant, and Shayla went to a store to have their photographs taken. The defendant argued with the victim during the session and appeared to be agitated. The photographer asked him what was wrong, and the defendant replied that he was "just sick of her." The defendant sat in a different area when the photographer took photographs of the victim and Shayla. The defendant paced about in a "very agitated" state when the victim declined to order photographs that included the defendant. The three left the store at about 8 P.M. and returned to the Attleboro apartment.

The defendant and the victim argued at the apartment. The victim told the defendant that "we're through," that they were just friends, and that it would be best for him to find employment.

Toombs went into the living room where he lay on a couch to watch a football game and fell asleep. Amanda, Bruce, and Tom were in their parents' bedroom. Shayla was in a separate room that she shared with the victim.

Toombs later woke up to Shayla's scream, "My daddy's beating my momma." Toombs went into a bedroom and saw the defendant pushing the victim against some furniture and heard the defendant swear at her. While Toombs yelled at the defendant to stop, the defendant punched the victim. Toombs told the defendant to get his clothes and to leave.

The defendant went to the kitchen. Toombs took Shayla and Amanda and put them on the living room couch. The defendant grabbed a knife in the kitchen and, concealing it, went back to the bedroom where the victim was lying down. The defendant said to the victim, "If I can't have you, no one can," and began stabbing her. The victim cried for him to stop, and then tried to escape into the hallway. The defendant followed her. When Toombs tried to grab the defendant, the defendant pushed Amanda. Toombs ran out the back door to telephone the police at a neighbor's house.

In another bedroom, the defendant continued to stab the victim over the cries and protests of Shayla and Amanda. The victim was on the bed, kicking the defendant. The defendant stabbed the victim's feet, and then her stomach. The defendant then went to the kitchen and tried to wash the blood off his hands and off the knife. He threw the knife into the sink, put on a shirt, and left.

The victim was crying and muttering. Toombs returned to the apartment and tried to stop the victim's bleeding. When the police arrived at 11:40 P.M., the victim was lying unconscious on the floor. The victim died as the result of some thirty stab wounds.

The defendant fled to a nearby railroad facility. He asked some railroad workers if he could sleep in a crew shanty located outside the train yard area. Several hours later, a police officer saw the defendant walking over a bridge and placed him under arrest. The defendant had blood on his clothing.

Deoxyribonucleic acid (DNA) testing of blood on the defendant's clothing and on the handle and blade of the knife

revealed DNA consistent with the defendant's DNA profile. Testing also revealed the victim's DNA profile on the defendant's clothing. The defendant's right thumbprint was found on the cold water knob to the kitchen sink faucet of the Attleboro apartment.

While at Bridgewater State Hospital, the defendant told another inmate that he had stabbed and killed the victim. Another person present asked the defendant some questions. The defendant said that he did not like the fact that the victim had received some money from a settlement, that the victim was seeing someone else, and that the victim thought she was better than he. The defendant stated, "She had it coming," and, "She got what she deserved." On another occasion, the defendant told the inmate that he was at the hospital so that he would be deemed incompetent to stand trial, and that he would get out in a couple of years if he "said he was crazy."

The defendant did not testify. His trial counsel presented evidence supporting a defense that the defendant was not criminally responsible under the standards of *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967). Following the defendant's arrest, a psychologist, Louis A. Roy, Jr., conducted a court-ordered preliminary interview of the defendant on December 3, 1999, within twelve to eighteen hours of the victim's murder, to determine whether further evaluation as to competency and criminal responsibility was warranted. The defendant told Dr. Roy that he wanted to die. Dr. Roy noted in the defendant's history that the defendant had experienced blackouts since adolescence, possibly related to substance abuse and head trauma as a child from having been hit by a baseball bat and from having been involved in an automobile accident. The defendant told Dr. Roy that he suffered from daily headaches. The defendant also reported having been repeatedly abused by his stepfather. The defendant stated that he had a history of alcohol and cocaine abuse, but had been in remission for at least one to three months. Dr. Roy recommended further evaluation to determine competency or lack of criminal responsibility.

Subsequently, in April, 2000, a psychiatrist, Dr. Keith Ablow, interviewed the defendant for approximately two hours. He

expressed the opinion that the defendant was competent to stand trial. Based on his review of records, and his interview with the defendant, Dr. Ablow concluded that the defendant suffered from three mental illnesses, namely, impulse control disorder, attention deficit disorder, and polysubstance dependence, all of which combined substantially deprived the defendant of his ability to conform his behavior to the requirements of the law at the time of the killing.

The Commonwealth rebutted the defendant's evidence with expert evidence from Paul Nestor, a psychologist. Dr. Nestor conducted competency and criminal responsibility evaluations of the defendant. He interviewed the defendant on several occasions, reviewed the defendant's hospital records, and examined other information provided by the Commonwealth.

When interviewed, the defendant had no difficulty understanding Dr. Nestor's questions and cooperated fully. The defendant, however, occasionally demonstrated a mild defiance of the rules and engaged in "intentional forgetting." Dr. Nestor expressed the opinion that the defendant had cognitive limitations related to his educational experience and developmental disability in that he probably had difficulty with learning in school, and the tests of his academic abilities demonstrated a third-grade level. Dr. Nestor further testified that the defendant understood things correctly and showed capacity, despite his cognitive limitations, to acquire, retrieve, and retain new information. The defendant's thinking was logical and sequential, with no indications of delusions, false beliefs, paranoid thinking, or hallucinations. The defendant showed no signs of psychosis. Dr. Nestor did not see any evidence of brain trauma, attention deficit disorder, or impulse control disorder. Dr. Nestor concluded that the defendant did not have any mental disease or defect at the time of the killing.

1. Under the standard that governs the performance of trial counsel in a case of murder in the first degree, see *Commonwealth v. LaCava*, 438 Mass. 708, 712-713 (2003), we discern no basis to disturb the judge's conclusion that the defendant's trial counsel made a reasonable strategic decision, agreed to by the defendant, to have the defendant wear prison clothing at trial. Trial counsel pointed out in his affidavit that

the defendant's wearing of prison clothing might "allay the jurors' fears that if they returned a verdict of not guilty by reason of insanity or adopted the theory of diminished capacity the defendant would be released into the community while still suffering from the defect of mind which caused him to commit the act that ended the life of his girlfriend." The judge, who found the defendant's trial counsel to be "a very experienced and capable practitioner," accepted trial counsel's affidavit on the point. This affidavit indicated that the matter of prison clothing and the reason therefor had been discussed with, and agreed to by, the defendant and that the suggestion had been reviewed by the defendant's relatives, who did not object. See *Estelle* v. *Williams*, 425 U.S. 501, 508 (1976). In reaching this conclusion, the judge rejected the defendant's contrary affidavit. Determining the truth of the matter was for the judge.

2. Further, based on the record before him, the judge acted in his discretion in concluding that the motion and supporting materials did not raise a substantial issue, and as such, the judge properly denied the motion for a new trial without conducting an evidentiary hearing. See *Commonwealth* v. *Denis*, 442 Mass. 617, 628 (2004).

3. The judge did not abuse his discretion in denying the defendant's motion requesting that proposed questions pertaining to violence against women be asked, in individual voir dire, of prospective jurors. See *Commonwealth* v. *Morales*, 440 Mass. 536, 548-549 (2003). The judge informed the venire of the nature of the case, disclosing that the defendant was charged with "the murder of [the victim], his girl friend, who was the mother of the defendant's four year old daughter," and that "[t]he cause of death is alleged to be multiple stab wounds." Members of the venire were advised that the defendant was to be tried as well on charges of armed assault with intent to murder and assault and battery by means of a dangerous weapon alleged to have been committed on the victim's mother's boy friend. The judge conducted individual voir dire on issues relating to interracial murder, see *Commonwealth* v. *Young*, 401 Mass. 390, 398 (1987), overruled in part on another ground in *Commonwealth* v. *Ramirez*, 407 Mass. 553, 555 (1990), and the issue of lack of criminal responsibility, see *Commonwealth* v.

*Seguin*, 421 Mass. 243, 249 (1995), cert. denied, 516 U.S. 1180 (1996). The standard questions were adequate in the circumstances to ferret out possible bias or prejudice on the part of prospective jurors.

4. The judge, noting security issues and limited court officers assigned to the case, denied the defendant's request to attend the view taken by the jury. The defendant's trial counsel, when asked by the judge, gave no reason that would require the defendant to be present on the view. The view itself, from what appears in the transcript, was unremarkable. No prejudice to the defendant's case has been shown to exist as a result of the judge's ruling. The judge acted within his discretion. See *Commonwealth* v. *Evans*, 438 Mass. 142, 150-151 (2002), cert. denied, 538 U.S. 966 (2003).

5. The evidentiary issues raised by the defendant lack merit.

a. Amanda, the eight year old half-sister of the victim, testified as a witness to the killing and about the relationship between the victim and the defendant. No objection to her competency to testify was made by the defendant's trial counsel, and there was no motion to strike her testimony. We reject the defendant's after-the-fact argument that the witness should not have been allowed to testify without a preliminary hearing to determine her competency. See *Commonwealth* v. *Lamontagne*, 42 Mass. App. Ct. 213, 216-217 (1997). The prosecutor permissibly examined the witness as to her competency in direct examination. It is manifest from the record that the witness was competent to testify and, specifically, that she appreciated the obligation of testifying truthfully. The prosecutor did not act improperly in examining her about her understanding of the differences between telling the truth and lying, and the importance of telling the truth.

b. The victim's mother, when asked by the prosecutor whether she had "notice[d] anything unusual about the defendant that would call into question his sanity," was permitted to answer, over objection, "He always seemed normal to me." The victim's father, when asked by the prosecutor whether the defendant "appear[ed] to you to have anything wrong with his mental faculties," was permitted to answer, "No, he didn't."

The witnesses were permitted to describe what they observed

about the defendant's conduct and demeanor. The questions and answers referred to above were part of lengthy examinations. The testimony, viewed in context, fell within the boundaries of observed appearances and was allowed in the judge's discretion. See *Commonwealth* v. *Smith*, 350 Mass. 600, 608-609 (1966). In any event, in view of the extensive expert testimony about the defendant's criminal responsibility, the jury could not have been misled into thinking that these fragments of testimony expressed improper lay opinions about the defendant's sanity.

c. There was considerable testimony about the defendant's controlling nature, the hostile relationship between the defendant and the victim, and his prior abuse of the victim. We reject the defendant's contention that much of the bad act evidence should not have been admitted. The evidence was probative to show a pattern or course of conduct by the defendant, to describe the entire relationship between the defendant and the victim, and to prove that the defendant acted intentionally and with criminal responsibility when he killed the victim. See *Commonwealth* v. *Butler*, 445 Mass. 568, 573-576 & nn.6, 8 (2005). See also *Commonwealth* v. *Young*, 382 Mass. 448, 463 (1981). We note that the judge, when necessary, gave proper limiting instructions.

d. Testimony by a police officer, who investigated a prior incident of abuse of the victim by the defendant, about the victim's statements, did not violate the principles of *Crawford* v. *Washington*, 541 U.S. 36 (2004), decided after this trial. Assuming, in the absence of any specific confrontation clause objection at trial, that the *Crawford* decision might apply retroactively, the testimony was properly admitted for a non-hearsay purpose that was carefully defined by the judge in a limiting instruction. See *id.* at 59. See also *Commonwealth* v. *Seabrooks*, 425 Mass. 507, 511 n.5 (1997), *S.C.*, 433 Mass. 439 (2001).

6. The refusal of the judge to instruct the jury, as requested by the defendant's trial counsel, on the effect of "alleged intoxication" on the defendant's mental impairment was not erroneous. There was testimony by a crime scene services technician of the State police that, at the time of booking, the defendant's eyes "were bloodshot and glassy," that his speech was "slightly slurred," and that he might have been "under the

influence of some type of drug." These observations, however, were made many hours after the murder and well after the technician had "processed" the crime scene. There was no evidence of the defendant's intoxication or drug impairment at the time of the killing. Rather, the evidence was substantial that he was not impaired by alcohol or drug use when he stabbed the victim. There was no objection to the judge's instruction on mental impairment, which was taken from the Model Jury Instructions on Homicide 60-62 (1999).

7. As noted, the judge instructed the jury on mental impairment in accordance with the Model Jury Instructions on Homicide, *supra.* In addition, he listed, and instructed on, the factors set forth in *Commonwealth* v. *Cunneen,* 389 Mass. 216, 227 (1983). Evaluating the charge in its entirety, the judge's instructions made clear to the jury that they should consider mental impairment on the question whether the killing was committed with extreme atrocity or cruelty. This "is all that the law requires." *Commonwealth* v. *James,* 427 Mass. 312, 316 (1998). There was no necessity, as the defendant now argues, for the judge to make specific reference to the *Cunneen* factors in the mental impairment instruction.

8. The killing was committed with brutality. The issue of criminal responsibility was tried fairly with adequate evidence to demonstrate that the defendant was criminally responsible when he repeatedly stabbed the victim. There was evidence that the defendant purposely concocted a lack of criminal responsibility defense. The verdict of the jury is supported by the evidence and is consonant with justice. There is no basis to grant the defendant any relief under G. L. c. 278, § 33E.

9. The order denying the defendant's motion for a new trial is affirmed. The judgment of conviction is affirmed.

*So ordered.*