## COMMONWEALTH *vs.* LEONARD LACY.

Suffolk.    March 1, 1976. — November 22, 1976.

Present: HENNESSEY, C.J., REARDON, QUIRICO, BRAUCHER, & WILKINS, JJ.

*Homicide. Error,* Whether error harmful. *Evidence,* Other offense, Relevancy and materiality, Dying declaration, Prior statement of witness corroborating his testimony. *Practice, Criminal,* Charge to jury, Disclosure of statements by witness, Examination of jurors.

At a murder trial, no reversible error appeared in a police officer's testimony that he told the defendant he would be taken to various courts, where the judge ordered the testimony struck and instructed the jury to disregard it and where the testimony was ambiguous

with respect to the commission of other crimes by the defendant. [365-366]

At a murder trial of a defendant who gained entrance to the victim's apartment through the use of a false identification card, there was no error in the admission of testimony by a witness that the defendant had visited her on two occasions, using the same identification card, even if it tended in some manner to show the commission of another crime. [366]

No reversible error was shown at a criminal trial by the admission of a jail identification card bearing a photograph of the defendant taken shortly after his arrest, after the defendant had introduced a similar jail identification card with a later picture showing him to have longer hair and a beard, unlike the earlier picture, where the judge ordered masked those words and phrases on the prosecution's card which did not appear on the defendant's card. [366-367]

Evidence at a trial for murder in the first degree warranted the judge's charge to the jury that it was open to them to find the defendant guilty of murder in the first degree upon a finding of extreme atrocity and cruelty. [367-368]

There was no merit in a criminal defendant's contention that the judge erroneously refused to admit evidence of the regulations of the Boston police department with respect to internal procedures for conducting lineups. [368]

There was no error in the admission of an in-court identification of a criminal defendant by a witness who had previously failed to identify the defendant in a police lineup. [368-369]

Under the rules then prevailing, no error appeared in the denial by a judge at a pre-trial hearing of a defendant's motions for access to statements of prosecution witnesses relative to identification, particularly where the defendant might have renewed his demand at trial but failed to do so. [369-370]

At a trial for murder in the first degree, there was no error in the admission of the victim's statements as to how she met her death through a witness who visited the victim at a hospital, where it appeared that the statements constituted a dying declaration. [370]

At a criminal trial, corroboration of in-court testimony of a police officer with a prior consistent statement was permissible to combat a charge of recent fabrication. [370-371]

At a trial for murder in the first degree, there was no error in the judge's instructions to the jury with respect to malice. [371-373]

At a trial for murder in the first degree, there was no error in the refusal of the judge to question prospective jurors as to whether they or any members of their families had ever been victims of assault, murder, or any other serious crime. [373]

INDICTMENT found and returned in the Superior Court on February 14, 1974.

The case was tried before *R. Sullivan*, J.

*Stephen Hrones* for the defendant.

*Robert J. McKenna, Jr.*, Assistant District Attorney, for the Commonwealth.

REARDON, J. This case is here under G. L. c. 278, §§ 33A-33G, on an appeal by the defendant from a conviction of murder in the first degree, and a subsequent sentence of life imprisonment. The facts are simply stated.

On December 14, 1973, between 11 A.M. and 12 noon, the defendant arrived and sought entrance at the apartment building located on Worcester Square, Boston, where the victim, Mrs. Lillian Fitzgerald, lived. A lodger coming to the door summoned the building custodian who, having viewed what purported to be an identification card, admitted the defendant on the basis that he was taking a survey of senior citizens and brought him to an upper floor to see the victim. Within a short time thereafter the victim, an aged woman living alone, was found crawling out of her apartment bleeding from the face. She was taken to the Boston City Hospital where she died eight days later. Two days after her death the defendant was apprehended while attempting to obtain entry to another apartment in the same manner. At trial three witnesses who had seen the defendant at the victim's apartment testified and identified him. The defendant has lodged a series of assignments of error, some of which are meritless. A discussion of them follows as they are argued serially in the defendant's brief. Additional relevant facts will be referred to as required.

1. The defendant assigns as error the admission of certain evidence which he asserts tended to prove the commission of other crimes. He first complains about testimony given by a police officer that he told the defendant "that this was the last of the ninth inning for him, and that he would be brought to different courts, to the Dorchester Court, Roxbury Court, to the Brighton Court and again to the Municipal Court." The trial judge ordered that that part of the testimony relating to the various courts be struck and instructed the jury to disregard it. In our view the corrective steps which were taken immediately by the judge were sufficient to negate the possibility of reversible error. *Commonwealth* v. *Martin*, 362 Mass. 243, 245 (1972). *Commonwealth* v. *Gordon*, 356 Mass. 598, 604 (1970). Furthermore, it could not be said that had the language

objected to (which was ambiguous with respect to the issue of other crimes) been presented to the jury in its original form it would have been prejudicially harmful.

Secondly, the defendant objected to the testimony of a Miss Horgan that he had visited her apartment on two different occasions. The first visit, on December 22, 1974, eight days after the attack on Mrs. Fitzgerald, led to an appointment being made for a second visit two days later. On the second visit he was arrested by police officers waiting in Miss Horgan's apartment. Her testimony concerned his appearance on the visits and his use of an identification card. Again, the evidence as to the commission of other crimes is at best ambiguous. Furthermore, the testimony was highly relevant on the question of identity of Mrs. Fitzgerald's attacker. The defendant on both visits to Miss Horgan's apartment was wearing clothes which matched the description of the clothes worn by the man who entered Mrs. Fitzgerald's apartment on the day of the attack. The method of gaining entrance to the apartments of both women, through the use of a false identification card, was the same. Also the card, which Miss Horgan identified as the one shown her by the defendant on both occasions, was identified by the custodian of the Worcester Square building as the one shown to him by the man he admitted to the building and escorted to the victim's door. The purpose of admitting the testimony in question was to show the identity of the person who perpetrated the attack on the victim. The evidence was highly probative on a crucial issue in the case and as such was admissible even if it tended in some manner to show the commission of another crime. See *Commonwealth* v. *Campbell, ante,* 40 (1976); *Commonwealth* v. *Eagan,* 357 Mass. 585, 589-590 (1970); *Commonwealth* v. *Lamoureux,* 348 Mass. 390, 393-394 (1965). We further note that the judge, at the insistence of the defendant, gave appropriate limiting instructions to the jury.

Finally, there was no error in the admission of a jail identification card offered by the Commonwealth to show

the appearance of the defendant shortly after his arrest (short hair, clean shaven) after the defendant had introduced a similar card with a later picture showing him to have a different appearance (Afro hair style and beard). It appears that the jail card introduced by the defendant was offered and admitted in its entirety and contained some entries which would indicate his commission of other crimes. The judge ordered certain portions of the card introduced by the prosecution masked (these were generally words and phrases which did not appear on the card offered by the defense). The remaining entries of which the defendant complains appear to be largely cumulative of those he himself had put before the jury through the jail card he had earlier introduced. In the circumstances no reversible error is shown. *Commonwealth* v. *Izzo,* 359 Mass. 39, 43 (1971).

2. The defendant objects to that portion of the judge's charge in which the judge told the jury that it was open to them to find the defendant guilty of murder in the first degree on a finding of "extreme atrocity and cruelty." The jury were charged also on the other two grounds for murder in the first degree, namely, murder committed with "deliberately premeditated malice aforethought" and murder committed "in the commission or attempted commission of a crime punishable with death or imprisonment for life." G. L. c. 265, § 1. As we have stated, "[s]ince any destruction of human life invariably includes some atrocity or cruelty, one cannot easily separate degrees of cruelty or atrocity by precise legal rules." *Commonwealth* v. *Connolly,* 356 Mass. 617, 628, cert. denied, 400 U.S. 843 (1970). Under our cases the inquiry focuses both on the defendant's actions, in terms of the manner and means of inflicting death, and on the resulting effect on the victim, in terms of the extent of physical injury and the degree of suffering endured. However, in the final analysis the issue must be left largely to the deliberation of the jury "who, as the repository of the community's conscience, can best determine when the mode of inflicting death is so shocking

as to amount to extreme atrocity or cruelty." *Id.* at 628. See *Commonwealth* v. *Harrison,* 365 Mass. 235 (1974); *Commonwealth* v. *Devlin,* 126 Mass. 253, 255 (1879).

In this case the victim was in her early eighties. The defendant was a young man, apparently not slight of build. The jury could have found from testimony by the associate medical examiner that the injuries she sustained were consistent with "at least three" blows. Another doctor testified that there were multiple blows. The physical condition of the victim was such that a social worker who had seen the victim from time to time prior to her injury stated that in viewing her in the hospital she did not at first recognize her because of her pitiable physical condition. There was other evidence along the same line. The jury would have been warranted in finding that the assault which produced the victim's eventual death was more than ordinary atrocity and cruelty. See *Commonwealth* v. *Connolly, supra; Commonwealth* v. *Knowlton,* 265 Mass. 382, 388 (1928).

3. An assignment that it was error for the judge to refuse to admit evidence of the regulations of the Boston police department as to the internal procedures for conducting lineups is without value, for such evidence was irrelevant and properly excluded.

4. A complaint is made that it was error to refuse to exclude a witness's in-court identification of the defendant. The witness was the building custodian who had admitted the defendant to the building on December 14 after being shown a card which purported to identify him as a social worker. This witness gave the police a description of the defendant later that day and was subsequently summoned to the police station to view a lineup. The defendant was in the lineup, being at that time a suspect in this case and having been arrested on another matter. The witness failed to point out the defendant in the lineup, and stated at trial that he was fearful and intoxicated at the time he was at the police station and actually had not looked at the persons in the lineup. This latter testimony was corroborated by a Boston police officer. Later, having been

shown a group of eight to ten photographs, he correctly identified the defendant, as he did at a probable cause hearing. Also, subsequent to the lineup and prior to trial the witness was shown the false identification card with the defendant's picture which the defendant had on his person at the time of his arrest. The witness identified the card as the one shown to him by the man he admitted to the building on the date of the attack on the victim. His identification at the time of trial was positive. This identification was based on a face-to-face meeting with the defendant at the time he made his fatal visit and on his conversation with him. He compared the photograph on the ID card which the defendant carried with the defendant who stood before him. He explained his failure to identify the defendant at the lineup. The defendant asks us to adopt a per se exclusionary rule condemning as constitutionally infirm all subsequent identifications of a defendant by any witness who had previously failed to select the defendant from a lineup. This we decline to do. While the lack of prior identification is one factor which may properly be considered by the jury in evaluating the witness's credibility, it need not be wholly dispositive. In this case, there was ample evidence as to why the witness had not identified the defendant at the lineup. There was no error. See *United States* v. *Wade,* 388 U.S. 218 (1967).

5. The defendant claims error in the denial to the defense of access to statements of prosecution witnesses relative to the identification of the defendant. This assignment stems from the denial of a defense motion at a pretrial hearing. At trial the defendant did not renew his demand for these statements. It was open to the defense counsel to renew the demand when the particular witness testified, and his failure to do so was a "crucial omission." *Commonwealth* v. *Lewinski,* 367 Mass. 889, 901 (1975). In any event, under the rules then prevailing the judge had broad discretion whether to permit discovery before trial of a statement of a prospective prosecution witness. See *Commonwealth* v. *Lewinski, supra* at 900 (1975). See also *Commonwealth* v. *MacDonald* (*No. 1*), 368 Mass. 395,

396-397 (1975); *Commonwealth* v. *Carita,* 356 Mass. 132 (1969). We discern no abuse of discretion.

6. Statements of the victim as to how she met her death were objected to. This testimony came in through a Commonwealth witness who testified to the sad physical condition in which she found the victim when she saw her. She described the victim as being badly beaten about the face, with her head swollen twice to three times its usual size "[b]ecause she had a lot of blood in her mouth, and it kept dripping down, and the nurses would have to come in and suction it up, so whenever she spoke a lot, she would cough and it would go down." (A doctor testified to the inhalation by the victim of blood into her lungs.) The witness stated that the victim asked her, "Please, could you get the priest to come to see me?" The evidence of the Commonwealth witness, which appears at worst to be cumulative, followed on evidence which it would appear permitted the judge and the jury to accept the victim's statements as her dying declaration. See *Commonwealth* v. *Polian,* 288 Mass. 494, 497 (1934), and cases cited. The request for a priest might well have indicated that the victim had lost hope of recovery. See *Commonwealth* v. *Dunker,* 363 Mass. 792, 794 (1973). We see no error in the admission of the evidence.

7. A complaint by the defendant that the prosecutor should not have been allowed to corroborate the in-court testimony of a police officer with a prior consistent statement falls upon a review of the transcript which makes it apparent that the evidence was introduced to combat a charge of recent fabrication. In such circumstances a prior consistent statement is admissible. *Commonwealth* v. *Pickles,* 364 Mass. 395, 401 (1973). *Commonwealth* v. *Giacomazza,* 311 Mass. 456, 469 (1942). In this instance a police officer testified that the victim stated that there was only one assailant. He was cross-examined on the basis that the official police "journal entry" stated that there had been two assailants. The cross-examination further indicated that the entry had been written by another officer. That officer was later called on to testify. He stated

that the victim reported only one assailant on the day in question, and the Commonwealth then attempted to introduce the "journal entry" as evidence of a handwriting error by the second officer. This the defendant objected to. The testimony offered by the Commonwealth was admissible on the basis that once the second officer testified to his handwriting error the charge of his recent fabrication which emerged from the cross-examination of the first officer became applicable to the second officer as well. The Commonwealth could properly attempt therefore to rebut the implication of his fabrication based on the writing which formed the basis of the journal entry. "The general rule with certain exceptions is well established that a witness whose testimony is contradicted is not entitled to bolster up his testimony and enhance his credibility by showing that he had previously made statements consistent with his testimony," *Wilson* v. *Jeffrey*, 328 Mass. 192, 194 (1951), but he may give evidence as to such statements "where it is claimed that the testimony is a recent invention or fabrication." *Walsh* v. *Wyman Lunch Co.*, 244 Mass. 407, 409 (1923). *Kelley* v. *Boston*, 296 Mass. 463, 465 (1937).

8. The judge's instructions to the jury on malice have come under a bifurcated attack by the defendant. He claims, first, that the jury were confused by being given six different definitions of the element of malice which are contradictory and, second, that the standard used to define malice was outdated, stating that the judge "apparently quoted from every old case he could find." We find these arguments to be without merit.

In the first approach by the judge to a definition, he stated correctly that malice does not "necessarily imply ill will" toward the person killed. See *Commonwealth* v. *Mangum*, 357 Mass. 76, 85 (1970); *Commonwealth* v. *Madeiros*, 255 Mass. 304, 309 (1926). He explained that the requisite intent can exist even if the defendant intended only to inflict "grievous bodily harm." *Commonwealth* v. *Mangum, supra* at 85. See *Commonwealth* v. *Campbell*, 352 Mass. 387, 399 (1967).

In particular the defendant argues that two of the instructions are based on different standards. In his brief he stated that the "latter two definitions set up different standards. One requires an 'intention to inflict serious injury' while the other requires an intention to use upon another a force that *will probably* (emphasis added) do grievous bodily harm' and will present likelihood of death."

However, the judge accurately pointed out that malice does not necessarily require intent to kill or intent to cause serious bodily injury but that it can be an intent to use a force which presents a "clear and plain likelihood that the other person will die." This language mirrors the wording used in *Commonwealth* v. *Chance,* 174 Mass. 245, 252 (1899): "If it had been necessary the jury properly might have been instructed that it is possible to commit murder without any actual intent to kill or to do grievous bodily harm, and that, reduced to its lowest terms, malice in murder means knowledge of such circumstances that according to common experience there is a *plain and strong likelihood* that death will follow the contemplated act, coupled perhaps with an implied negation of any excuse or justification (emphasis added). In 1967 this court reaffirmed this definition in *Commonwealth* v. *Campbell, supra* at 399, thereby refuting counsel's argument that the judge relied only on "old" cases to support his instructions.

Finally, the defendant claims that the judge instructed the jury that " 'any deliberate and cruel act' is enough without any mention of the intent to inflict serious injury!" On the contrary, the instruction was: "I have indicated to you that malice includes every unjustifiable and unlawful motive, and malice can be implied from any deliberate and cruel act against another." The judge correctly stated that malice can be inferred from the defendant's conduct. See *Commonwealth* v. *Gricus,* 317 Mass. 403, 410 (1944). Circumstantial evidence is clearly permissible to establish motive. *Commonwealth* v. *Mangum, supra* at 85. Thus what the defendant's counsel refers to as the "fourth definition" of malice is better described as an explanation of evidentiary rules.

The defendant claims that the fifth definition is different from one of the prior definitions. However, it seems to be identical to the third definition and therefore is not discussed separately. The defendant never elaborated his objection to the sixth definition. In sum, the judge's instructions are supported by the case law and are complementary rather than conflicting.

9. The defendant requested the judge to submit a list of several questions to the jurors prior to seating them having to do with whether they or any members of their families had ever been the victims of assault, murder, or any other serious crime. The transcript indicates that the judge asked questions additional to those required under G. L. c. 234, § 28. We said in *Commonwealth* v. *Harrison,* 368 Mass. 366, 371 (1975), and cases cited, that "[t]raditionally . . . it is within the wide discretion of the trial judge whether to refine or improve on the subjects of G. L. c. 234, § 28, by going into more detail." We see no error in the judge's action in this regard here.

10. We do not deem it necessary to discuss other assignments of error which were argued as they are without merit. Pursuant to our powers and duty under G. L. c. 278, § 33E, we have examined and appraised the whole record and see no reason to disturb the judgment.

*Judgment affirmed.*