COMMONWEALTH *vs.* LESTER KEY.

Suffolk.   November 13, 1985. — December 23, 1985.

Present: GRANT, KAPLAN, & SMITH, JJ.

*Evidence,* Other offense, Relevancy and materiality.

At the trial of a rape case in which a photograph of the defendant identified by the victim as that of her assailant was admitted in evidence, there was reversible error in the admission of evidence with respect to the circumstances in which the photograph had been taken, including testimony that, after the defendant had been arrested on an unrelated charge, a police officer thought the defendant looked like a photograph selected earlier by the victim as resembling her assailant, and that another police officer, having noticed that the defendant's hair was shorter than the victim had described her assailant's as being, elicited from the defendant the comment, "I got a haircut two days ago." [295-298]

INDICTMENTS found and returned in the Superior Court Department on December 15, 1982.

The cases were tried before *Sandra L. Hamlin,* J.

*Maureen B. Brodoff,* Committee for Public Counsel Services, for the defendant.

*William M. White, Jr.,* Legal Assistant to the District Attorney (*Michael J. Traft,* Assistant District Attorney, with him) for the Commonwealth.

KAPLAN, J. Because of the admission, over objection, of evidence that was inadmissible and also seriously prejudicial to the defendant, the judgments of conviction herein must be reversed and the verdicts set aside. It is regrettable but unavoidable that the case may have to stand for a second trial.

At trial upon indictments for aggravated rape and unarmed robbery, the main issue was the identification of the accused. We first recount the substance of the evidence properly admitted, and then turn to the dubious material.

1. After a visit with a friend living at the Orchard Park project in the Roxbury section of Boston, the victim (we call her Jane) at 10:45 P.M., August 22, 1982, left for the subway station at Dudley Street, intending to take the Orange line to the South End where she lived. She was accompanied on her ten-to-fifteen minute walk to the station by a young man, her friend's cousin. At the station she saw a group of some ten people waiting outside the turnstiles and, feeling safe in that company, she told her companion that he could leave. As she traversed the east-loop ramp, Jane saw and passed by a man walking in circles and mumbling. After noticing the man, Jane turned away from him in order not to draw his attention.[1] In the next quarter hour the group before the turnstiles, disappointed that a train had not arrived, and perhaps supposing that service was closed, began to disperse, finally leaving Jane and the mumbling man alone on the ramp. Shortly Jane felt herself grasped from behind around her waist.[2] A man, whom she took to be the mumbling man, told her to shut up, he would kill her, threw her to the ground, raped her, and then made off with her shoulder bag and its contents.

Jane was finally able to beg a dime at a nearby bar and telephoned another friend who came by and met her; and early that morning she reached home by taxi. She refrained from washing herself, and about 10 A.M. she appeared with her sister at Boston City Hospital where a rape kit was prepared.[3]

Brought that day to the district 2 station of the Boston city police, she was shown a great many photographs but did not select any of them as corresponding to her memory of the assailant.

About ten days later, the MBTA police became interested; the crime had been committed in their bailiwick. They learned

---

[1] Jane was cross-examined about the lighting, distances involved, etc., as bearing on the strength of her observations.

[2] It was brought out that the embrace was especially painful because she suffered from a hernia. This went to her capacity to observe.

[3] The kit was officially analyzed many weeks after the event. The vaginal smear showed sperm cells but no foreign pubic hair was found.

from the Boston police that Jane had described the man as black, in his late twenties, dark-skinned, tall, slim-built, with a medium Afro.[4] On September 2, MBTA officers Joseph Indorato and Frederick Zakrzewski showed Jane perhaps 300 photographs. She selected one, not as the man, but as resembling him — "could be the guy." The photograph was of one Donald Williams. According to Jane, the hair and eyes resembled the assailant's, but the assailant's were "wild." The officers left saying they would be back if they "had any suspects."[5] Next day the officers returned and showed Jane an array of ten pictures, not including the Williams picture. Jane made a positive identification of one picture, that of the defendant, Key. (These ten pictures together with the Williams picture were received in evidence as exhibits.[6])

2. We pass to what we have called the dubious material. It arose from certain police work testified to by the two MBTA officers.[7] After the first session with Jane, these officers had gone to the Dudley station and spoken with Officer George Ward, who was assigned there. They informed him of Jane's description of the man and showed him the Williams picture. That same afternoon Key was arrested at Dudley station for an (unrelated) indecent assault and battery of a sexual nature allegedly committed upon a woman on a bus as it came into

---

[4] We put this in general form without dwelling on particulars, nor do we detail the respects in which Key differed from Jane's description.

[5] Perhaps an unfortunate expression, as it might create an expectation in Jane about the next array that would be shown to her.

[6] Jane identified Key in a courtroom where his probable cause hearing was to be held. There was some dispute whether she pointed to him as he entered the room or at a later stage.

Jane had no opportunity to identify the defendant at the trial proper because he absented himself after jury empanelment, but appeared after the trial was over. In view of our decision on the merits, we need not deal with the contention of the defense that the judge did not consider sufficiently whether the defendant was so far incompetent that his absence from trial should be held involuntary.

[7] See the caution about admission of such evidence in Commonwealth v. Barrett, 386 Mass. 649, 652 (1982). See also Commonwealth v. Nassar, 351 Mass. 37, 42-43 (1966). (It is not suggested that evidence of this kind is invariably irrelevant or prejudicial.)

the station. Officer Ward thought Key resembled Williams. Officers Indorato and Zakrzewski were now summoned, and Indorato, after giving Key his Miranda rights,[8] questioned Key about whether he lived in the area, and so forth, and then (having noticed that Key's hair was closer than medium Afro) elicited from Key, "I got a haircut two days ago." On the following day Jane was shown the array of ten pictures. These included — and she selected — the picture of Key taken when he was booked on the assault.

It will be observed that Jane was told nothing about Key's arrest or the origin of his picture which she selected.[9] The Commonwealth, however, desired to put these matters before the jury. Recognizing that there was at least a doubt about admissibility, the prosecutor moved in limine for a ruling that the whole account (as set out in our preceding paragraph) could go in, omitting only the nature of the charge for which Key had been arrested.[10] The judge allowed the motion over objection by the defense, and the jury heard the evidence as thus abbreviated. The evidence was stressed in the Commonwealth's opening and closing statements.

The prosecutor urged upon the trial judge that the jury would be "deceived" if this story was kept from them. On appeal, the Commonwealth argues that, were the story withheld, the defense could get some advantage by raising doubts about how Key's picture found its way into the ten-picture array.[11] In some indefinite way the Commonwealth may be suggesting that the evidence was relevant to the issue of identification.

[8] Key had also been given his rights earlier.

[9] So the jury might find, although there was testimony by an attorney from the Roxbury Defenders Committee, who had represented the defendant at the probable cause hearing, that Jane told him the MBTA officers "came to her home with several photographs and that they had just arrested someone and they wanted her to look at a group of pictures."

[10] Originally the prosecution wanted the present case tried together with the case of the assault of September 2 upon the other woman, but it withdrew from this position and pressed its in limine motion.

[11] But if the defense began to question the officers about this, it would risk opening the way for proof by the Commonwealth.

The defense contends convincingly that it was irrelevant. The evidence did not show or tend to show a modus operandi — surely it did not, when the sexual nature of the assault was omitted (and we think it would not, even if that element were included: so different were the circumstances of the two episodes). Contrast *Commonwealth* v. *Lacy*, 371 Mass. 363, 366 (1976). Further, the evidence did not place the defendant at the scene of the crime at any telling period of time. Contrast *Commonwealth* v. *Rhoades*, 379 Mass. 810, 819 (1980). That Officer Ward thought Key resembled the Williams picture was irrelevant; it would remain so even if Ward could somehow be qualified in his absence as an expert on resemblances. What counted was the quality of Jane's identification and that was a question for the jury, with the exhibits made part of the record. See *Commonwealth* v. *Nassar*, 351 Mass. 37, 41-42 (1966); *Commonwealth* v. *Anderson*, 19 Mass. App. Ct. 968, 969 (1985).

Irrelevant on the issue of identification, the evidence in question could not properly be tendered in direct proof of the proposition that the defendant had previously committed a separate, unrelated crime to that for which he was now standing trial. To admit the evidence on that basis would be an extreme example of a subversion of the rule which prohibits the introduction, even of a defendant's convictions of other offenses, when offered as probative of a current criminal charge. See the discussion of the rule and its qualifications (none applicable here) in Liacos, Massachusetts Evidence 420-423 (5th ed. 1981 & Supp. 1985). See also *Commonwealth* v. *Yelle*, 19 Mass. App. Ct. 465, 468-472 (1985).

As the evidence lacked any proper basis for admission, and was strictly irrelevant, there would be error in its admission even if only minor prejudice was generated.[12] Here there was serious prejudice. Jane was properly kept in ignorance of the origin of the picture that turned out to be Key's; all must agree

---

[12] See *Harper* v. *United States*, 239 F.2d 945, 946 (D.C. Cir. 1956), referred to in *Commonwealth* v. *Deschamps*, 1 Mass. App. Ct. 1, 2-3 (1972); *Commonwealth* v. *Yelle*, 19 Mass. App. Ct. at 472.

that to disclose to her how the picture came to be taken would have corrupted the process of selection by a massive suggestiveness. But substantially the same suggestiveness attached to the disclosure of the same circumstances to the jury. The law which insists on "sanitizing" mug pictures, see Smith, Criminal Practice and Procedure §§ 466-467 (2d ed. 1983), surely sees prejudice in relating Key's picture to an arrest within days of the crime at bar for an alleged crime committed in the same place, Dudley station. There is yet another element of prejudice here. This lies in the admission of evidence that Officer Ward saw a resemblance between the Williams picture and Key. That fact, in the eyes of the jury, might improperly stamp a kind of official imprimatur upon the supposed resemblance. We do not believe the prejudice was eliminated by the judge's instruction that the jury should refrain from speculating about the nature of the alleged crime for which Key had been arrested, and from counting the arrest against him. This left the evidence in the case for the indefinite but prejudicial purpose for which it had been introduced. The defense was not obliged to ask for a more sweeping instruction. That would be at the risk of increasing rather than diminishing the prejudice by fastening attention on the evidence wrongly admitted. See *Commonwealth* v. *Whitehead*, 379 Mass. 640, 661 (1980). Indeed, it is not apparent what instruction could come near purging the error.

*Judgments reversed.*

*Verdicts set aside.*