COMMONWEALTH vs. RICHARD F. JACKSON.

Suffolk. December 8, 1993. - May 18, 1994.

Present: LIACOS, C.J., WILKINS, NOLAN, LYNCH, & GREANEY, JJ.

*Evidence*, Prior misconduct, Relevancy and materiality. *Homicide. Malice. Kidnapping. Practice, Criminal*, Required finding, Capital case.

At the trial of indictments for first degree murder and kidnapping, the judge did not err in admitting evidence of the defendant's prior bad act as bearing on the issue of identity, where the Commonwealth demonstrated that the prior event, which was not too remote, and the circumstances of the crimes charged had such unique or distinctive similarities as tended to prove the defendant was the person who committed the crimes charged. [835-838, 840-842]

Evidence at a criminal trial was sufficient to support verdicts of guilty on indictments for kidnapping and first degree murder. [842-844]

INDICTMENTS found and returned in the Superior Court Department on July 19, 1990.

The cases were tried before *James D. McDaniel, Jr.*, J.

*Jonathan Shapiro* (*Jenny C. Chou* with him) for the defendant.

*Kenneth H. Anderson*, Assistant District Attorney, for the Commonwealth.

LIACOS, C.J. The defendant appeals from his convictions of murder in the first degree and kidnapping. As grounds for reversal, the defendant argues that the trial judge erred in allowing the admission of evidence of a prior bad act offered for identification purposes. The defendant also argues that the evidence was insufficient to support the guilty verdicts, and that his motion for required findings of not guilty should have been allowed. Mass. R. Crim. P. 25 (a), 378 Mass. 896 (1979). We address both of these arguments. In addition, we have reviewed the entire record before us as we must pursu-

ant to G. L. c. 278, § 33E (1992 ed.). We conclude that admission of the prior bad act evidence was not erroneous, and that there was sufficient evidence on which the jury could have found the defendant guilty. Finally, we conclude that there is nothing in the record that warrants relief under § 33E.

1. *Facts.* We recite the facts which the jury could have found. On July 7, 1990, at approximately noontime, the body of William A. McGunagle was found in Savin Hill Park in the Dorchester section of Boston.[1] Other than part of a T-shirt sleeve on the left arm, McGunagle's body was nude. McGunagle's arms and legs were tied together behind his back, with his legs bent backward and upward toward his arms, in a manner commonly referred to as "hog-tied." See *Commonwealth* v. *Angiulo*, 415 Mass. 502, 507 (1993). In addition, a rope was tied from McGunagle's neck to the rope binding his wrists.[2] McGunagle's head and neck had several severe abrasions, lacerations, and bruises. The soles of his feet and his toes were dirty, abraded, and lacerated.[3] There also were superficial injuries to McGunagle's chest, back, and abdomen. There was a one-quarter inch tear in the lining of McGunagle's anus consistent with insertion of a large,

[1] A witness for the Commonwealth testified that while she and a companion were sunbathing in Savin Hill Park at around noontime on July 7, 1990, the defendant came to her and asked whether she lived nearby and whether she had a telephone. The defendant told her that he just had discovered a body while walking in another section of the park.

[2] The record reveals that a single rope was used to bind McGunagle's ankles and wrists together. It is not clear from the record whether that same rope or a separate rope ran from his neck to his arms. The pathologist who performed the autopsy on McGunagle's body testified, in response to a question whether "the ropes" were intact when he examined the body, that "they were." He then went on to testify that "the rope" was cotton and ran from the neck to the wrists to the ankles. A photograph submitted in evidence by the Commonwealth appears to show separate ropes binding the body.

[3] The medical examiner testified that the injuries to the feet were consistent with the victim's having walked over a sharp object. He further testified that in his opinion the injuries to the feet occurred before the victim was bound since he was bound in such a way that he would not have been able to walk.

hard object. McGunagle's blood alcohol level was 0.47 per cent and his blood contained 0.7 milligrams per cent of phenobarbital. The cause of death was ligature strangulation. The approximate time of death was from ten to twelve hours before the body was discovered.

As noted above, note 1, *supra,* it was the defendant who "discovered" the victim's body. He told the witness whom he approached that he had been walking in the park because his back was bothering him. There was evidence that the defendant had an existing back problem. The body was discovered, however, several feet from the footpath where the defendant claimed he was walking. The body largely was obscured from the view of someone on the footpath by dense vegetative growth.

The witness to whom the defendant reported finding the body testified at trial. She lived across the street from the entrance to the park. In the early morning hours of the day the body was discovered, the witness was watching television when she heard an automobile outside her home. She saw two men getting out of a large white automobile.[4] She gave descriptions of the two men which generally fit the descriptions of the victim and of the defendant. She saw the larger man walk to the trunk of the automobile, open the trunk, and close it. He then spoke to the smaller man and they went into the park. The witness thought that the smaller man appeared intoxicated. The two men entered the park and sat on some rocks. The witness then went to bed.

In investigating the murder, police officers questioned the defendant because he had discovered the body. He said that he had touched the victim to see if he was breathing, but said that he did not recognize the body. The next day, police officers questioned the defendant again. One officer intended to ask the defendant about an incident involving John McHugh, but asked him, mistakenly, if he remembered "Michael Mc-

---

[4] Several days later, on seeing the defendant's automobile at the police station, the witness recognized it as the automobile she had seen outside her house early in the morning of the murder.

Hugh." The defendant replied that he did not, so the officer reminded the defendant of the details. The officer again asked him, mistakenly, if he remembered "Michael Mc-Hugh." The defendant replied that the officer was trying to trick him and that he did not know any "McGunagle." At this point, the body of the victim had not yet been identified by the police as that of William McGunagle.

A search of the trunk of the defendant's automobile produced, among other things, a can of transmission fluid, a length of clothesline rope, three hand-held vacuum cleaners, and a roll of duct tape. A chemist who examined the transmission fluid found in the defendant's trunk and the fluid extracted from the T-shirt sleeve on the victim, testified that, in his opinion, the transmission fluid was consistent with the liquid extracted from the sleeve.[5] A criminalist testified that the rope found in the trunk of the defendant's automobile was similar in all characteristics to the rope used to bind the victim. He also testified that hairs found in the defendant's automobile were similar to hair samples from the victim.

Before trial, the defendant moved to exclude from admission at trial evidence relating to an incident involving the defendant which occurred in May, 1988 (McHugh incident). The judge conducted a hearing on this motion at which several witnesses testified. We summarize the testimony adduced at that hearing and repeated at trial.

On May 28, 1988, at approximately 3:30 A.M., three investigators from the Boston fire department's arson squad were returning from a fire at 120 Grampian Way in the Savin Hill neighborhood of Dorchester.[6] While traveling on Grampian Way, two of the arson investigators simultaneously noticed

---

[5]The Commonwealth suggested, through evidence at trial, that the defendant attempted to or succeeded in burning the victim's clothing, using the transmission fluid as an accelerant.

[6]Grampian Way is adjacent to Savin Hill Park. A row of houses separates the park from Grampian Way and a fence separates the houses from the park. Access to the park may be gained from Grampian Way by way of the land on which the houses are situated.

the nude body of John McHugh[7] in the front seat of a large, white, four-door automobile pulled over at the side of Grampian Way. The automobile belonged to the defendant. He still had this same automobile in July, 1990. The defendant was standing outside the automobile. The arson investigators stopped to investigate. On touching McHugh, one of the investigators realized that McHugh was alive. His eyes and mouth were covered with silver duct tape and his hands and legs were hog-tied behind his back with clothesline rope. There was no rope running from his neck to his arms. McHugh's body did not have abrasions, lacerations, or bruises.

One of the arson investigators removed the duct tape from McHugh's mouth and eyes. After removing the tape, the investigator detected a strong smell of alcohol emanating from McHugh's mouth.[8] Soon, Boston police officers and emergency medical technicians, who had been summoned by the arson investigators, arrived on the scene. One of the emergency medical technicians untied McHugh. McHugh, whose clothing and boots were found in the defendant's automobile, was assisted in dressing himself. He was unable to put on his underwear because it had been torn in such a way that it was no longer wearable.

Although the defendant was taken into protective custody by police officers, he was not arrested. No charges were filed against him. McHugh testified that he did not pursue criminal action against the defendant because McHugh was embarrassed by the whole incident. At the time, the defendant

---

[7]McHugh's body was nude except for a pair of socks on his feet. McHugh testified at trial regarding this incident.

[8]At trial, McHugh testified that he had been drinking beginning sometime in the afternoon of May 27, 1988, at Bulldogs, a barroom in Dorchester. He continued drinking throughout the day and night, until Bulldogs closed at 1 A.M. McHugh testified that, before he began drinking, he had ingested Percocet and cocaine and had smoked an angel dust cigarette. McHugh testified that, when he left Bulldogs, he "blacked out" and did not remember anything after getting into a passing automobile. He testified on direct examination that it was the defendant's automobile into which he entered, but on cross-examination, he admitted that he really could not remember whether it was the defendant's automobile.

first claimed that McHugh had tried to rob him, then claimed that McHugh was so severely under the influence of drugs and alcohol that the defendant had to hog-tie him in order to restrain him.

After this hearing, the judge ruled that the incident met the requirements of *Commonwealth* v. *Brusgulis*, 406 Mass. 501, 505-506 (1990), and that he would allow the admission of evidence of this prior incident. The judge therefore denied the defendant's motion to exclude the evidence. During the trial, over the defendant's objection, several witnesses testified to the events of the McHugh incident, describing it substantially similar to the way it was described at the motion hearing. Just before the testimony was offered at trial, the judge instructed the jury that the evidence of the McHugh incident could be used only for the issue of identification. In charging the jury at the close of all the evidence, the judge again instructed the jurors that the evidence of the prior incident could be used only for the issue of identification. He further instructed the jury that to use the prior incident for identification purposes, they must be satisfied beyond a reasonable doubt that "the prior misconduct or event and the circumstances of the crime or crimes here charged, have such similarities as to be meaningfully distinctive," and that the "Commonwealth must prove beyond a reasonable doubt uniqueness of technique, a distinctiveness or a particularly distinguishing pattern of conduct common to the current and former incidents as tending to prove that the defendant was the person who committed the crime or crimes charged."[9]

2. *Prior bad act evidence.* Evidence of prior bad acts generally is not admissible to prove bad character or propensity to commit the crime charged, but may be admissible if rele-

[9]The defendant urges that part of the judge's instruction on the permissible use of the McHugh incident was hopelessly confusing. On review of the instructions as a whole, we conclude that the judge properly instructed the jury that the McHugh incident may be used by them only on the issue of identity, and if so used, then also on the issue of the defendant's intent, but not to find that the defendant had the propensity to commit the crimes charged. See *Commonwealth* v. *Helfant*, 398 Mass. 214, 226-228 (1986).

vant for some other purpose. *Commonwealth* v. *Brusgulis*, *supra* at 504-505, and cases cited. *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986). When prior bad acts are offered to prove a defendant's identity, that evidence is likely to have an improper influence on the jury. *Brusgulis*, *supra* at 505. Thus, "evidence of prior bad acts is not admissible to prove identity unless there is a special mark or distinctiveness in the way the acts were committed (i.e., in the modus operandi)." *Id.*, citing *Commonwealth* v. *Lacy*, 371 Mass. 363, 366 (1976). See *Commonwealth* v. *Helfant*, *supra* at 235 (O'Connor, J., dissenting). See also *Commonwealth* v. *Cordle*, 404 Mass. 733, 747 (1989) (Liacos, J., dissenting), *S.C.*, 412 Mass. 172 (1992) (for identification, prior bad act must be "so unusual and distinctive as to be like a signature"), quoting McCormick, Evidence § 190, at 559 (3d ed. 1984).

In order for evidence of prior bad acts to be admitted to prove identity, the Commonwealth must show that "the prior events and the circumstances of the crime charged have such similarities as to be meaningfully distinctive. . . . There must be a uniqueness of technique, a distinctiveness, or a particularly distinguishing pattern of conduct common to the current and former incidents to warrant the admission of evidence of prior bad acts as tending to prove that the defendant was the person who committed the crime charged." (Citations omitted.) *Brusgulis*, *supra* at 505-506. It is not enough that there is some "general, although less than unique or distinct, similarity between the incidents." *Id.* at 507. When reviewing a trial judge's decision to admit evidence of prior bad acts to show identity, we examine whether the judge committed palpable error. *Commonwealth* v. *Cordle*, *supra* at 744.

In *Brusgulis*, we concluded that it was error to admit evidence of prior acts (sexual assaults or attempted sexual assaults on women), alleged to have been committed by the defendant, where the features that were common to the incidents in question were also common generally to numerous assaults or attempted assaults on women (secluded site,

use of threatening but not unique words, use of force, abandonment because of fear of discovery). *Brusgulis, supra* at 506-507. We also noted that the differences in the way the incidents were committed were substantial. *Id.* at 507. See *Cordle, supra* at 748 (Liacos, J., dissenting) ("A marked difference in circumstances prevents the original episode from functioning as an identifying factor"), citing *Commonwealth v. Key*, 21 Mass. App. Ct. 293, 297 (1985).

In *Commonwealth* v. *Lacy, supra* at 365, the defendant was charged with murder; he gained entrance to the victim's apartment building using false identification. Ten days after the murder, the defendant was arrested when he tried to gain entry to another apartment in the same building. *Id.* During the subsequent incident, the defendant wore clothes matching the description of those worn by the man observed ten days earlier, tried to gain entrance to the building in the same manner (using false identification), and used the same false identification card. *Id.* at 366. This court concluded there was no error in admitting evidence of the subsequent incident. *Id.* We did not note any substantial differences between the two incidents.

The Commonwealth argues that the similarities between the two incidents, including the victims, the timing, the location, the manner and the means by which the crimes were carried out, when considered as a whole, bear the requisite mark of distinctiveness. The Commonwealth asserts distinctiveness in that the victim and McHugh both were hog-tied and both were nude except for minimal clothing (a T-shirt sleeve, in the former case, and socks, in the latter case).[10]

---

[10]In its brief, the Commonwealth asserts that both victims were bound in similar manner, with the ropes looped and tied in similar or the same way. The Commonwealth then refers us to the testimony of Boston police Officer Thomas J. Gallagher to support this argument. The portion of Gallagher's testimony relating to the similarities in the tyings of McHugh and McGunagle, however, was struck by the judge. We disregard the Commonwealth's citation to that portion of the testimony.

At trial, the defendant moved for a mistrial, arguing that any prejudice resulting from Gallagher's testimony regarding his opinion as to the similarities between the knots in the McHugh incident and in the murder was

Examining the over-all pattern allegedly followed by the defendant in both incidents, it is significant that a distinctive pattern is shown because each involved a very unusual method of incapacitation.

The Commonwealth also argues that the manner of tying demonstrates distinctiveness. At the pretrial hearing and at trial, there was extensive testimony about the ropes, loops, and knots used in both the murder and the McHugh incident. We summarize that evidence.

Thomas J. Gallagher, a Boston police officer at the time of trial, was an emergency medical technician in May, 1988.[11] He testified that he untied McHugh after he was discovered by the arson investigators in the defendant's automobile. Gallagher testified that McHugh was bound with one piece of rope.[12] McHugh's arms were behind his back. The rope was looped once around each wrist at the wrist bone, then looped around both wrists together two to four times. The rope was tied a few inches below the wrists in a knot consisting of two to four loops.[13] Gallagher called this a "taut line

---

not curable. The judge noted that the curative instruction was given so close in time that it "dissipate[d] any particular taint." On appeal, the defendant argues that the judge's refusal to grant a mistrial was reversible error.

We are not persuaded by this argument. Gallagher's opinion as to similarities was only a small part of his entire testimony. He testified at length about the knots binding McHugh that he untied and also about the knots binding McGunagle that he observed in photographs. He was cross-examined effectively by the defense attorney. The judge told the jury that they must decide for themselves whether there were any similarities. Given that the nature of the knots itself contributes little to the finding here of a distinctive pattern of operation in both incidents, any prejudice introduced by Gallagher's opinion was minimal.

[11]Gallagher testified at trial and at the pretrial hearing on the defendant's motion to exclude evidence of the prior incident. His testimony on both occasions was substantially the same.

[12]Lieutenant Roy Burrill of the fire department's arson squad characterized this rope as "clothesline" rope.

[13]At the pretrial hearing, Gallagher testified that the knot consisted of two loops, but then at trial, he testified that the knot consisted of three to four loops. On both occasions, he testified that the knot at the wrist was the same as the knot at the ankles.

hitch,"[14] and testified that it is a knot commonly used in the military to pitch tents. The rope continued down to Mc-Hugh's ankles, which were pulled upward behind his back. Like the wrists, the ankles were bound at the ankle bone, first individually with one loop around each ankle, and then together with two to four loops. The rope was tied off with a knot heading back up toward the wrists, a few inches above the ankles. This knot was the same as the knot that was tied just below the wrists.

Gallagher was shown several photographs of the murder victim depicting the method of tying used. Gallagher testified that the knots tied below the wrists and above the ankles, as depicted in the photographs, were taut line hitches.[15] On cross-examination, he testified that the knot at the ankles in the photographs did not consist of the same number of loops as the knot at the wrists in the photographs. He also testified that, on viewing the photographs, he could see only one loop around both wrists, but could not tell if the single loop went around each wrist separately or both wrists together.

Doctor Gerald Feigin, associate medical examiner for Suffolk County, testified that he performed an autopsy on McGunagle's body. He described the manner in which McGunagle was bound: "The rope . . . was looped around the neck twice and tied to the wrists, turned double and then to the ankles, where it was looped four times."[16] He testified that the rope was "turned double" on the right wrist "three inches above the end of the bone towards the pinky," and on

---

[14]There was confusion during Gallagher's testimony whether the knot was a "taut" line hitch or a "taunt" line hitch. This confusion was not resolved. We refer to the knot as a taut line hitch.

[15]Over the defendant's objection, Gallagher gave his opinion that the knots binding McHugh and the knots binding McGunagle were similar, and also that the loops binding the two were similar. On reconsideration, the judge struck Gallagher's opinions regarding the similarities between the two tyings, and instructed the jurors to disregard those parts of Gallagher's testimony. See note 10, *supra.*

[16]Doctor Feigin referred to the manner in which McGunagle was tied as "hog-tied," and noted that hog-tying was discussed during his training as a forensic pathologist and was considered necessary knowledge.

the left wrist "one inch above." As for the ankles, the rope was immediately above the malleolus of the right foot and one inch above the malleolus of the left foot.

The Commonwealth further asserts similarity between the two incidents in that the victims of each incident, McHugh and McGunagle were both males, with histories of drug or alcohol problems, who were highly intoxicated at the time the respective incidents occurred, "making them both pliable for the defendant." Furthermore, both men were acquainted with the defendant, so they had "a degree of trust in him."

The Commonwealth next relies on the timing and location of the two incidents: both occurred in the early morning hours and both occurred in the Savin Hill neighborhood of Dorchester, within 400 yards of each other. We agree that both of these similarities contribute to a finding of a distinctive pattern in both incidents. We note that, as for the location, the McHugh incident occurred on a public street near the park while McGunagle's body was found inside the park.

In passing on whether the McHugh incident is admissible to show identification, we are mindful that dissimilarities between the previous incident and the crime charged may prevent the admission of evidence of the previous incident. See *Key, supra* at 297. In our review of the record in this case, we have discovered some dissimilarities between the McHugh incident and the murder. The Commonwealth argues that most of these distinctions should be disregarded. The Commonwealth contends that, had the defendant not been interrupted by arson investigators, he would have done to McHugh what he allegedly did to McGunagle, and therefore we should draw that inference. We conclude that this aspect of the Commonwealth's argument, if accepted, would relieve the Commonwealth of its burden of establishing that the prior incident and the crimes charged actually share unique or distinctive features. More importantly, the Commonwealth's contention that we should draw such an inference assumes the answer to the question whether the defendant murdered McGunagle. In essence, the Commonwealth would require a finder of fact to assume, prematurely and without

proof, the identity of the defendant as the perpetrator of the crimes charged, and then, based on that assumption, to assume and to infer further that the defendant would have completed the McHugh incident in the same way that McGunagle was murdered, and finally, having inferred that the defendant would have murdered McHugh by hog-tying and beating him, to use that inference as evidence that the defendant is the one who hog-tied and beat, and thus murdered, McGunagle. Such circular logic based wholly on speculation and a mere assumption cannot be used to satisfy the strict rule that prior bad acts used to show identity actually must share some uniqueness or distinctiveness with the crime charged. We decline to pile inference upon inference in the manner that the Commonwealth urges on us. See *Commonwealth* v. *Ferguson*, 384 Mass. 13, 17-18 (1981).

Although we decline to make the inferences suggested by the Commonwealth and therefore do not dismiss these dissimilarities out of hand, we nevertheless conclude that they were not so significant that they "prevent the original episode from functioning as an identifying factor." *Commonwealth* v. *Cordle*, 404 Mass. 733, 748 (1989) (Liacos, J., dissenting), citing *Commonwealth* v. *Key*, 21 Mass. App. Ct. 293, 297 (1985).

The defendant argues that the McHugh incident, occurring over two years before the murder, was too remote in time to be admissible for identification purposes. There is no bright-line test for determining whether a prior incident is too remote to be admitted to prove the defendant's identity. *Commonwealth* v. *Helfant*, 398 Mass. 214, 228 n.13 (1986), and cases cited. In *Brusgulis*, we determined that two prior incidents occurring four years and ten years, respectively, before the crime charged were inadmissible to prove identity, although we did not address the remoteness issue. *Brusgulis*, *supra* at 503 n.3, 506-507. In *Helfant*, three years was not too great a time lag to render the prior incident inadmissible. *Helfant*, *supra* at 228. In this case, we conclude that slightly more than two years between the incidents, although near the limit, was not too great, in consideration of the over-all

distinctiveness with which the two incidents were carried out, and especially considering the strikingly similar physical proximity of the two incidents.

On viewing both incidents in their entireties,[17] we conclude that the question whether to admit evidence of the McHugh incident as a prior bad act to prove identity was a close one. Although we may have decided the question differently, we cannot say that the judge was palpably wrong in concluding that there was a uniqueness of technique, a distinctiveness, or a particularly distinguishing pattern of conduct common to the current and former incidents.[18] Furthermore, we cannot conclude that there was palpable error in the judge's implicit conclusion that the probative value of the evidence outweighed its "potential for undue prejudice." *Brusgulis, supra* at 505, and cases cited.

3. *Sufficiency of the evidence.* The defendant argues that the evidence was insufficient for the jury to return guilty verdicts on the indictments. The defendant's main contention is that there was no evidence establishing that he was the murderer. In passing on the sufficiency of the evidence, we view the evidence in the light most favorable to the Commonwealth to determine whether the evidence and the permissible inferences drawn therefrom are sufficient "to bring minds of ordinary intelligence and sagacity to the persuasion of [guilt] beyond a reasonable doubt." *Commonwealth* v. *La-*

---

[17]The Commonwealth asserts, as a similarity, that each incident involved an automobile. The Commonwealth does not suggest that an automobile was used in any particular way, but merely that an automobile was involved. We note that automobiles are commonly used in the commission of crimes, so this similarity is not persuasive.

There was evidence that an automobile similar to the defendant's was seen outside the park before the murder. If the jury believed that it was the defendant's automobile, then that would be independent evidence of the defendant's presence on the scene at or near the time of the murder.

[18]It would have aided us greatly if the trial judge had made written findings, or put his findings on the record, regarding the features common to the two incidents which led him to conclude that the standard of *Commonwealth* v. *Brusgulis*, 406 Mass. 501 (1990), was satisfied.

*timore*, 378 Mass. 671, 676 (1979), quoting *Commonwealth
v. Cooper*, 264 Mass. 368, 373 (1928).

There was evidence from which the jury could have in-
ferred that the defendant was seen at the scene of the crime
with the victim shortly before the time of death. Hair similar
to the victim's was found in the defendant's automobile, sug-
gesting that the victim had been in the defendant's automo-
bile at some point. The identification of the defendant's auto-
mobile by a witness is further evidence of his presence at
that time. In addition, the evidence of the McHugh incident,
which we have concluded was not admitted erroneously,
tended to establish the defendant's identity as the perpetrator
of the murder.[19] On several occasions, the defendant dis-
played consciousness of guilt. There was evidence from which
the jury could have found that the defendant possessed the
means to commit the crime (clothesline found in his trunk)
and also that he tried to destroy evidence of the crime (trans-
mission fluid, found on the T-shirt sleeve and in trunk, may
have been used to burn clothing).

The jury could have found that the murder was committed
with extreme atrocity or cruelty or that it was premeditated
and deliberate. In addition to the circumstances of the mur-
der which speak for themselves, there was testimony by the
medical examiner that the cause of death was gradual stran-

---

[19]The defendant argues that *Commonwealth* v. *Mazza*, 399 Mass. 395
(1987), and *Commonwealth* v. *Salemme*, 395 Mass. 594 (1985), compel
the conclusion that the evidence was insufficient to convict the defendant.
Those cases are inapposite.

In *Mazza, supra* at 397-400, we concluded that consciousness of guilt
plus presence at the scene of the crime alone were insufficient to support a
guilty verdict. Here, in addition to evidence of the defendant's conscious-
ness of guilt and evidence of his presence on the scene at the time of the
murder, we have the additional evidence of the defendant's identity as the
perpetrator of the crime.

In *Salemme, supra* at 596-601, the evidence was insufficient because
there was no evidence tending to show that it was the defendant, and not
the other person known to be present at the scene just before the crime
took place, who committed the crime. Here, there was no other potential
perpetrator present at the scene whose presence would have created sub-
stantial doubt whether the defendant was the perpetrator of the murder.

gulation over some period of time and that the victim was severely beaten before death. Also, if the jury were satisfied that the defendant perpetrated the McHugh incident, they could have used that incident to infer the defendant's malice on this occasion. See *Commonwealth* v. *Zagranski*, 408 Mass. 278, 281 (1990), and cases cited.

As for the kidnapping charge, there was evidence that the victim was transported, that he was alive at the time that he was bound, and that the manner in which he was bound would have rendered him incapacitated. From the circumstances, the jury could infer that this binding was against McGunagle's will.

Based on our review of the entire record, we conclude that the evidence was sufficient to support guilty verdicts on the indictments.

4. *Review under G. L. c. 278, § 33E.* We have reviewed thoroughly the entire record before us as is our responsibility under G. L. c. 278, § 33E. We conclude that nothing in the record warrants our granting any relief under that section.

5. *Conclusion.* The judgments of the Superior Court are affirmed.

*So ordered.*